George A. Wells, Administrator of Helene Roberts, de-
ceased, now to the use of John Welles Hollenback
and L. D. Shoemaker *v.* The New England Mutual Life
Insurance Company of Boston, Massachusetts, Ap-
pellant.

191      207
27 SC ⁴357

*Life insurance—Public policy—Abortion.*

Where a policy of life insurance provides that it shall be void if the in-
sured dies in consequence of any violation of, or attempt to violate, any crim-
inal law of the United States or of any state or county where the insured
may be, it would be contrary to public policy to permit a recovery on a policy
of life insurance, if death results from the insured having voluntarily sub-
mitted herself to an illegal operation known to her to be dangerous to life,
with intent to cause an abortion, without any justifiable medical reason.

In an action on a policy of life insurance where the uncontradicted testi-
mony is that the insured died from the results of an abortion to which she
had voluntarily submitted herself, without any justifiable medical reason,
it is grave error for the court to submit to the jury the question whether
there was any other cause of death than the abortion, and whether there
was any medical occasion for the operation.

Argued April 11, 1899.   Appeal, No. 61, Jan. T., 1899, by
defendant, from judgment of C. P. Luzerne Co., May T., 1895,
No. 99, on verdict for plaintiff.   Before STERRETT, C. J., GREEN,
MITCHELL, DEAN and FELL, JJ.   Reversed.

Assumpsit on a policy of life insurance.   Before LYNCH, J.

On August 13, 1891, Helene Roberts, an unmarried woman,
twenty-seven years old, took out a policy of life insurance in
the defendant company.   On August 19, 1891, she assigned the
policy to John Welles Hollenback and L. D. Shoemaker, the
use plaintiffs, to secure them for certain loans which they had
made to her.   On November 26, 1892, she died, being still un-

married. Proofs of deaths were regularly furnished the defendant showing the death to have resulted from "peritonitis and septicæmia, the result of abortion." The company refused payment, and thereupon George A. Wells took out letters of administration on the estate of the assured, and brought suit to the use of the assignees of the policy.

The case has been tried three times in the lower court and has been before this Court on appeal once before, reported in 187 Pa. 166.

The policy provided that it should be void if the insured died in consequence of any violation or attempt to violate any criminal law of the United States, or of any state or country in which the insured might be.

The facts appear by the opinion of the Supreme Court.

The court charged in part as follows:

There is no sworn testimony in the case to show when the operation or the abortion was committed, or by whom it was committed. The nearest approach is the testimony of Dr. Crawford, in his deposition, in which he says that when he went into the room where Miss Roberts was lying dangerously ill, he at once recognized from the odor in the room that there had been an abortion, or a miscarriage. But there is no sworn testimony whatever that any person used any illegal means to procure this abortion. I use the word sworn with care, gentlemen. [The testimony rests principally upon the alleged admission of Miss Roberts. This presents two inquiries which should be submitted to you. First, did she make the admissions which have been sworn to? Not whether they are true, but did she make them? She was not under oath, but very ill.] [5] It is testified to by Dr. Crawford, Dr. Stoeckel, Mrs. Harvey, the mistress of the boarding house, Mr. Whalen, and Mr. Davison, the alderman. It is a question for you to decide, not for the court. Where it is clearly or satisfactorily proved to the jury that an admission or statement was made by a person it should have weight, but you will keep in mind too that all verbal statements or admissions when repeated by another are liable to change, by dropping a word here, or adding one there. The weight of the evidence, indeed all of the evidence submitted, tends to show that this unfortunate woman did make certain statements as to

her condition, and as to how it was brought about. [If you conclude, after an investigation of this matter, that she did not make any statements of the kind charged you may stop there. But if you conclude that she did make the statements, or substantially the statements testified to, you will take the next step. Were they true?] [6] There is no sworn evidence whatever that Dr. Dan, as he is called, performed an operation upon this woman, either criminal, legal or illegal. There is the statement which it is alleged Miss Roberts made that Dr. Dan performed the operation. As to this you will inquire. [Take the condition of the woman as she was, as she has been shown to you by the evidence, the state of her suffering and illness. Do you believe from the evidence if she did make the statement it was true, and that it was Dr. Dan at Nanticoke who performed the operation?] [7] She had been there several times before and he had been unsuccessful, and finally he had made a botch or a bungling job of it, to use the doctor's words. [No person has testified that he saw the woman in Nanticoke, or how she was able to return to Wilkes-Barre. You will take all these matters in consideration in arriving at a decision. Suppose, gentlemen of the jury, you answer these two questions in the affirmative : First, that the operation had been performed upon her in Nanticoke, and next that such statement is true.] [8] The next question for you to pass upon will be, was there sufficient medical reason for performing the operation ? Because as stated by both gentlemen, and by the doctors, an abortion is simply the premature birth of a child, and there may be many accidental or legal abortions, in other words, abortions which are not criminal. From the evidence in this case do you believe that this woman, unmarried, voluntarily submitted herself to have an abortion performed, without justifiable medical reasons for so doing? The stress of the case is there. Now, what evidence is there upon this question? At the time Dr. Guthrie examined Miss Roberts, in August, 1891, a year and about three months prior, the organs and parts of the body examined by him were in good condition. So far as appears in the case, from that time up to the time of the unfortunate death, there was no medical or surgical examination of the woman. You have the fact that the woman was unmarried; it has not been disputed that she was pregnant, with child, the foetus being

about three months of age at the time of the delivery. It is not necessary to prove by direct and positive evidence that there was a medical necessity for the operation. If you find in the case indirect and circumstantial evidence which satisfies you that there was no justifiable or good medical reason for it, you should find a verdict in favor of the defendant company. There is some medical evidence in the case. Dr. Crawford in his deposition has testified as follows : " Q. Could the lacerations of the womb as described by Dr. Kirwin have been produced by an abortion other than a criminal abortion ? A. Well, perhaps, that may be a hard question to answer. Lacerations of the womb sometimes occur from spontaneous delivery, but usually not at an early period, at full time. Where the fœtus is large the womb is sometimes ruptured, but I don't think that, in delivery at an early date. I would say, however, if it is proper, that the condition, the lacerations that Dr. Kirwin described would correspond fully with the description which she gave to me of the operation that had been produced—the violence that was done to her womb at the time of the operation." It is not a question of the violence which was done to the womb, or whether she died in consequence. The question is, does the fair weight of the evidence satisfy you that there was a medical reason for this operation ? Again, Dr. Stoeckel testified substantially that she was unable to give an opinion or would not give an opinion. Upon a hypothetical question put to Dr. Guthrie, called by the defendant, he stated from the facts submitted to him he was unable to give an opinion. Dr. Bullard and Dr. Guthrie gave what in their judgment were conditions existing in a female, pregnant, which would justify or give good medical reasons for an abortion. One, as I remember it, is the presence of Bright's disease of the kidneys, which as time progresses would probably cause convulsions, and produce the woman's death. Dr. Bullard spoke of a cancer of the womb, and perhaps both doctors gave as a reason malformation of the pelvis, and perhaps other reasons. Whether these conditions existed in this unfortunate girl at the time of the operation is not given by any of the doctors. Again, gentlemen, suppose you should decide there was an operation performed upon this woman, submitted to by her voluntarily, and without justifiable medical reasons, there is still another question. Was the death which occurred the direct result of the

operation? For example, if a woman were to have a criminal abortion performed upon her which injured her very much, she lingered for sometime, then other matters set in, and she died from other causes, it would not void the policy. If void at all for this reason it must be because death is the direct, and not the indirect, result. I think the doctors, so far as they testify upon the subject, practically agreed that death resulted from septicæmia, or blood poisoning, which was the result of the abortion. When was this operation performed? How long before death? [Did any other cause, taking in consideration where it was alleged it was performed, intervene, which produced blood poisoning, or septicæmia, and cause death? If it did, the company will have to pay the amount of this policy. If it did not, you should return a verdict in their favor.] [9]

Defendant's sixth point and the answer thereto were as follows:

Under all the evidence in the case there can be no recovery on the policy. *Answer:* The court declines to affirm this point. [4]

*Errors assigned* among others were (4–9) above instructions, quoting them.

*W. S. M'Lean* and *J. B. Woodward*, for appellant.—Where there is no real controversy as to the facts the court may give a binding instruction to the jury: Cougle v. McKee, 151 Pa. 602; Gardner v. McLallen, 4 W. N. C. 435.

*H. W. Palmer*, with him *John T. Lenahan*, for appellee.— When there is any evidence which alone would justify an inference of the disputed fact it must go to the jury, however strong or persuasive may be the countervailing proof: Howard Express Co. v. Wile, 64 Pa. 201; Reel v. Elder, 62 Pa. 316.

OPINION BY MR. JUSTICE GREEN, April 24, 1899:

We are clearly of opinion that the learned court below should have affirmed the sixth point of the defendant and directed the jury to render a verdict for the defendant. There was no dispute about the facts of the case nor any question as to the law. That the deceased woman voluntarily submitted to an operation for abortion upon her person, and that she caused it to be done

by her own importunity to that end, and that she died from the direct effects of the operation, were established by the overwhelming testimony in the case, without the least shade of contradictory evidence. The substance of all this was conceded in the charge of the court to the jury, and the judge instructed the jury that if they believed that the operation was submitted to voluntarily, without any justifiable medical reason, they should find for the defendant. The court affirmed the first and second points of the defendant which presented the subject in that aspect alone. But the learned court intimated that there might have been some other intervening cause that produced the death of the party, and submitted that question to the jury thus: "Did any other cause, taking in consideration where it was alleged it was performed, intervene, which produced blood poisoning or septicæmia and caused death? If it did, the company will have to pay the amount of this policy. If it did not, you should return a verdict in their favor." As there was not the smallest fragment of testimony as to the existence of any other cause of the death of the insured than the abortion, it was grave error to submit such a question to the jury. It only tended to mislead them and direct their attention to a false issue.

There was no question that the policy was a Massachusetts contract, and was governed by the law of that state. It was also shown that the Supreme Court of that state had decided in a case almost precisely similar to this that there could be no recovery on a policy of life insurance upon the ground of public policy if death results from the insured having voluntarily submitted herself to an illegal operation, known to her to be dangerous to life, with intent to cause an abortion, without any justifiable medical reason: Hatch v. Mutual Life Ins. Co., 120 Mass. 550.

The testimony in the present case proved conclusively and without the least contradiction that the insured procured the operation for an abortion to be performed upon her person, and that she died in direct consequence of the operation. Dr. Crawford testified on this subject as follows: "She told me in the mean time that she had undergone an operation, she had an abortion. . . . She told me that it was done in Nanticoke one week, I think, or about one week, prior to that time; that it was done by the insertion of an instrument into her womb. She told me

too that several previous attempts had been made by the same person to produce the abortion; that those attempts had failed. At the time she mentioned (a week before) she had again visited the abortionist and he then performed a different operation, he did what he called dilating her womb, that is introduced in and forced it open." He also testified that he told her she would certainly die, and she replied, " Oh, no, I am not going to die. I have had as many as six abortions, or had an abortion produced as many as six times, and I have always gotten well, and I will now." She repeated a similar statement in the presence of Mrs. Harvey, when she said, " Oh, pshaw, I am not going to die; I have had this done two or three times before," and to Mr. Whalen, who testified, " Well, she said she had that done several times before, that she would get over it; " and to Mr. Davison, who testified that she said, " She would not die, that this had been done before and she had always recovered.". To Dr. Stoeckel, who delivered the fœtus, she named the person who performed the operation, saying it was a Dr. Dan, of Nanticoke. She was asked: " Q. What did she say about Dr. Dan, if anything? A. She said that he had performed several operations which were not successful. Q. On her? A. On her. And she asked me, to use her own words, if I thought he hadn't made a botch of it. . . . Q. Whether or not she told you how many times she had been down to see Dr. Dan? A. She spoke of two or three times." Dr. Stoeckel also testified that she did not discover any malformation of the womb, and when asked whether she discovered any medical reasons for the abortion, replied, " I didn't discover anything of that sort." Dr. Crawford testified directly that she died from the effects of an abortion. In addition to this the medical testimony all showed that the conditions resulting from an abortion were present and that her death was the consequence of those conditions.

Against all this testimony there was not a particle of evidence in contradiction. There was not so much as a suggestion that there was any medical occasion for the operation, and the court was in serious error in submitting such a question to the jury. It was not necessary to establish by specific proof that there was no such necessity, because the whole of the testimony disclosed the purpose of the deceased to have the operation performed in order to get rid of an illegitimate fœtus, but **Dr.**

Stoeckel did testify that she could not discover any medical reasons for the abortion.

In the Hatch case the Supreme Court of Massachusetts decided that there could be no recovery in such circumstances on the ground of public policy, saying : " We are of opinion that no recovery can be had in this case, because the act on the part of the assured causing death was of such a character that public policy would preclude the defendant from insuring her against its consequences ; for we can have no question that a contract to insure a woman against the risk of her dying under or in consequence of an illegal operation for abortion would be contrary to public policy, and could not be enforced in the courts of this commonwealth." We see no reason to question the soundness of this proposition, and it has our approval. As we have a criminal statute imposing severe punishment for the perpetration of the crime of abortion, it follows that our own public policy corresponds with that pronounced by the Supreme Court of Massachusetts. But in addition to this the offense is a crime at common law. In 1 Whart. on Criminal Law, section 592, it is said, " At common law the destruction of an infant unborn is a misdemeanor supposing the child to have been born dead, though if the child die subsequently to birth from wounds received in the womb it is homicide."

In the case of Mills v. Com., 13 Pa. 633, we said : " Miscarriage, both in law and philology, means the bringing forth the fœtus before it is perfectly formed and capable of living ; and is rightfully predicated of the woman, because it refers to the act of premature delivery. The word abortion is synonymous and equivalent to miscarriage in its primary meaning. It has a secondary meaning in which it is used to denote the offspring. But it was not used in that sense here, and ought not to have been. It is a flagrant crime at common law to attempt to procure the miscarriage or abortion of the woman, because it interferes with and violates the mysteries of nature in that process by which the human race is propagated. It is a crime against nature which obstructs the fountain of life and therefore it is punished." In 1 Whart. on Criminal Law, sec. 599, it is said, " All parties concerned in the offense are responsible, whatever may be the part they take." We do not think it can be questioned that the woman who solicits the commission of the

offense, and submits her body for its perpetration, can be regarded as other than a participant in its commission, and is therefore criminally responsible. Viewed in that light in the present instance, the deceased comes directly within the operation of the prohibitory clause of the policy, for she was actually engaged in the violation of the criminal law of Massachusetts, where the contract was made, and of Pennsylvania, where she was at the time the offense was committed. The act was also highly immoral and illegal, as well on her part as on the part of the person who performed the operation, and therefore it would be contrary to public policy to permit a recovery. Upon the whole case it was the plain duty of the court below to direct a verdict for the defendant.

The case of Morris v. Life Assurance Co., 183 Pa. 572, has no application, as its controlling facts are entirely different.

Judgment is reversed and judgment is now entered in favor of the defendant.