18624

The STATE, Respondent, v. Launey C. WELLS and Waldo Jones, Appellants

(153 S. E. (2d) 904)

*Messrs. Pritchard, Myers & Morrison,* of Charleston, *for appellant, Launey C. Wells,*

*Jack H. Page, Esq.,* of Conway, *for appellant, Waldo Jones,* cites:

*Messrs. Arthur G. Howe, Solicitor,* and *A. Arthur Rosenblum, Assistant Solicitor,* of Charleston, *for respondent,*

March 28, 1967.

Bussey, Justice.

Appellants Wells and Jones were indicted, convicted and sentenced in General Sessions Court of Charleston County for the crime of conspiracy to commit abortion. There are several grounds of appeal, of which some are urged by both appellants, while others are asserted by the appellants sep-arately. They both contend that they were entitled to directed verdicts of not guilty for insufficiency of evidence, which contention will be dealt with first.

In passing upon this question, it is well settled that the evidence, and inferences which reasonably can be drawn therefrom, must be viewed in its most

favorable light for the State. See cases collected under West's South Carolina Digest, Criminal Law, Par. 753(2). It is not the function of the court to pass upon the weight of the evidence, but to determine its sufficiency to support the verdict, and where there is any evidence, however slight, on which the jury may justifiably find the existence or non-existence of the material facts in issue, or if the evidence is of such character that different conclusions as to such facts reasonably may be drawn therefrom, the issues will be submitted to the jury, see cases collected in West's South Carolina Digest, Criminal Law, Par. 741(1).

We, accordingly, proceed to state and review the evidence and the inferences reasonably drawn therefrom, in the light of the applicable principles of law. Both Wells and Jones were practicing naturopaths in this state, when the practice of naturopathy was outlawed in the year 1956. They had known each other since some time in the 1920's when Wells was a student at the National University of Physicians and Surgeons, Therapeutics, Washington, D. C., where Jones was for a time one of Wells' instructors. According to their testimony, they had no contact thereafter with each other until about 1944, when Wells was taking the board examination in South Carolina. According to them, they were not again in contact until 1956, when they both participated in the effort to defeat the legislation which outlawed the practice of naturopathy in this state. Testimony on their behalf is to the effect that after 1956 they had no contact with each other until the time of the trial in the instant case.

Jones practiced in Horry County until 1956, and in the year 1964 was living at Garden City near Myrtle Beach in Horry County. The record fails to disclose what occupation, if any, he followed from 1956 to 1964.

Wells practiced in Charleston County where he, with the assistance of his wife, was operating a clinic in 1956. When the practice of naturopathy was prohibited, Wells and his wife secured the services of a Dr. Behling, who is a medical

doctor, in the operation of the clinic, where Wells continued to work, ostensibly as an assistant to Dr. Behling, Wells being so engaged in the summer of 1964.

On July 16, 1964, one Carol Franklin, a 23 year old unmarried woman, suspecting that she was pregnant, consulted one of the leading physicians in the City of Charleston who confirmed her suspicion and concluded that she was then approximately four months pregnant. In her dilemma, Carol confided in and consulted with one Maxie Ellisor, the operator of a bingo game on the Isle of Palms, where Carol resided. Ellisor had been acquainted with Wells for some five or six years, and had for a time operated a bingo game at Myrtle Beach. Ellisor and Jones both deny that they knew each other. In any event, Ellisor directed Carol to Wells, whose assistance Carol sought to effect an abortion. Upon her first contact with Wells, he wanted to know who had sent her, and ascertained that Ellisor had done so.

Wells, inferentially because he first wanted to check with Ellisor, told her to either call back or come back on the following Friday. She returned on the following Friday, and, after examination and some discussion, Wells assured her that a miscarriage could be accomplished by a series of shots, the cost of which would be $50. The series of shots prescribed by Wells was administered by one or the other of two nurses who worked for Wells. In addition, on Wells' prescription, she took castor oil at home. On or about August 26, 1964, Wells informed Carol, following a fluoroscopic examination, that the baby had dropped to one quarter of an inch from where it would come out and for her to come back on Friday, August 28, and if the baby was still in that position, he would give her a shot of PIT (PIT is the abbreviation for Pitocin, a prescription drug which causes the uterus to contract. Among other things, it is administered to cause a miscarriage). On the 28th, she returned to obtain the shot of PIT, but after another fluoroscopic examination she was advised by Wells that the baby "had gone back up too far", and that the shot would not help.

He also told Carol there was nothing further he could do, and refunded to her $20 which she had paid on account. Carol then asked Wells if he knew of anyone who could perform the abortion, and he told her that he knew of a doctor, but did not know if he was still working "in that field", and for Carol to call him back that night at 6 o'clock.

In accordance therewith, Carol did make the call, and was informed that the doctor's name was Jones at Myrtle Beach. She was further told by Wells to contact their mutual friend, Ellisor, for specific directions to Jones' house and as to the price Jones would charge her for an abortion. In accordance with this advice from Wells, she contacted Ellisor and got specific information from him. The price given her was $150, which amount she borrowed from a finance company.

On the next Monday afternoon, August 31, following the directions given her by Ellisor, she went to the home of Jones at Garden City, who met her in the yard of his residence and was expecting her. Jones directed her to proceed to a designated apartment at a motel some miles north of Myrtle Beach where Jones promptly met her, and proceeded to open her cervix with an instrument. He advised her that she would abort the following day, and sent her back to her home at the Isle of Palms.

Her water ruptured on the following day, but she did not abort, and on Wednesday night she started hemorrhaging rather severely. She did not immediately seek medical attention, but on Friday telephoned the clinic with which Wells was connected and was advised by either Wells or one of his nurses not to worry that everything would be all right. By Friday night her condition was such that she had to seek attention at the Medical College Hospital, where it became evident that an abortion had been attempted upon her and that infection had set in. With medical assistance, the baby was delivered that night, but lived only several minutes.

There was no direct evidence to prove any meeting, communication or agreement between Wells and Jones. Appel-

lants urge that the circumstantial evidence is insufficient to establish a conspiracy between them, but concede that their conviction is not totally dependent upon proof of a conspiracy between those two, because if a conspiracy existed between one of the appellants and a co-conspirator, the other appellant could well have joined the conspiracy without having any direct agreement or dealing with the appellant as to whom the conspiracy was already in existence. They argue, however, that there could have been no conspiracy between Wells and Carol Franklin, and, hence, there was no conspiracy which Jones could have joined.

Appellants' argument in this respect is predicated on the rule of law referred to as "Wharton's rule" and as the "concert of action" rule, which is set forth in 16 Am. Jur. (2d) 135, Conspiracy, Sec. 16, as follows:

"Sec. 16. Liability where object of conspiracy can only be committed by all parties to agreement.

"Where co-operation or concert between two or more persons is essential to the commission of a substantive crime and there is no ingredient of an alleged conspiracy that is not present in the substantive crime, it is held that the persons necessarily involved cannot be charged with conspiracy to commit the substantive offense and also with the substantive crime itself.

"The rule that an agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy where the crime is of such a nature that it necessarily requires the participation of two persons for its commission is sometimes referred to as the 'concert of action rule' or as 'Wharton's rule.' The rule does not apply where the substantive offense that is the object of the alleged conspiracy can be committed by a single person. In other words, where more parties participate in the conspiracy than are logically necessary for the commission of the substantive offense contemplated by the conspiracy, the Wharton rule does not apply."

The quoted rule has apparently never been considered or applied in this jurisdiction, although its existence was recognized in *State v. Ferguson,* 221 S. C. 300, 70 S. E. (2d) 355, where the court said,

"It is true that in some cases where concerted action is necessary, as for example certain sexual offenses, it is not permitted to charge one in the same indictment with a conspiracy and with the substantive crime."

While the rule has been applied in other jurisdictions, within certain limitations, in various situations, it apparently arose in connection with, and has been more frequently applied to, sexual offenses, such as adultry and fornication. It is interesting to note that the rule has been the subject of considerable criticism. See the opinion in the case of *Robinson v. State of Maryland,* 229 Md. 503, 184 A. (2d) 814. In support of their argument as to the application of "Wharton's rule", and apparently independently thereof, appellants contend that Carol Franklin, the victim of the abortion, could not be a co-conspirator with Wells or Jones.

While it is said in 15A C. J. S., Conspiracy, § 49, p. 778, "* * * a woman may conspire with others to procure an abortion on herself.", there is substantial authority to the contrary. See *People v. Buffum,* 40 Cal. (2d) 709, 256 P. (2d) 317; *In re Vince,* 2 N. J. 443, 67 A. (2d) 141; *Commonwealth v. Fisher,* 398 Pa. 237, 157 A. (2d) 207. We deem it unnecessary, however, for us to decide in this case, and we do not decide, whether a woman may be indicted for conspiring with another to procure an abortion on herself. It is also unnecessary, we think, for us to determine to what extent, if any, this court should adopt or follow "Wharton's rule".

Even if it be conceded that such rule be sound, it clearly has no application to this case. The indictment named Carol Franklin as a co-conspirator, but only Wells and Jones were indicted. In the indictment, it is alleged that Wells, Jones and Franklin conspired with divers other evil dis-

posed persons, whose names were unknown to the grand jurors, to commit the crime of abortion. The substantive crime which it is alleged they conspired to commit is defined in Sec. 16-82 of the 1962 Code, from which we quote in part as follows,

"Any person who shall administer to any woman with child, prescribe for any such woman or suggest to or advise or procure her to take any medicine, substance, drug or thing whatever or who shall use or employ or advise the use or employment of any instrument or other means of force whatever, with intent thereby to cause or procure the miscarriage, abortion or premature labor of any such woman, * * *, shall * * * be deemed guilty of a felony * * *."

We think it perfectly obvious that the foregoing "substantive offense" which was the object of the alleged conspiracy can be committed by one individual. For this reason, the rule relied upon by appellants does not apply. The test under the rule is not whether the woman actually participated, but whether the substantive offense could be committed without any action on her part. But, even assuming that the substantive offense could not have been committed without the active participation of Franklin, the rule still would not apply because it is stated that,

"* * * where more parties participated in the conspiracy than are logically necessary for the commission of the substantive offense contemplated by the conspiracy, the Wharton rule does not apply."

While not indicated, the evidence discloses that Ellisor and Wells' nurses actively participated in the conspiracy with Wells. The conspiracy having been clearly established, the evidence further abundantly proves that Jones, whether contacted by Wells or Ellisor, joined in furthering the conspiracy and actually accomplished the object thereof. It is contended by Wells that, even admitting a conspiracy, he withdrew therefrom when he refunded Franklin's money on August 28, and told her that there was nothing

further he could do. Assuming that such constituted a withdrawal, rather than simply a change of course, and that he did, in fact, withdraw from the conspiracy, the evidence reflects that he promptly rejoined and set about sending Franklin to Jones. There is no merit in the contention of the appellants that they, or either of them, were entitled to a directed verdict for insufficiency of evidence.

There is no merit in the contention of Jones that his trial in Charleston County rather than Horry County was improper. Venue of a prosecution for conspiracy may be laid in either the county in which the agreement was entered, or in any county in which an overt act was done by any of the conspirators in furtherance of their common design. *State v. Hightower,* 221 S. C. 91, 69 S. E. (2d) 363. Here the evidence reflects that the conspiracy was entered into in Charleston County and joined by Jones. Moreover, the overt act committed by Jones in Horry County was intended by him to take effect, and did take effect, in Charleston County where the abortion and resulting death of the baby occurred. *State v. Morrow,* 40 S. C. 221, 18 S. E. 853.

Both Wells and Jones assert that they are entitled to relief because of the alleged disqualification of a juror, one Ricketts. The record discloses that Ricketts, and other jurors, were placed on *voir dire* examination by the court, which failed to disclose any disqualification as to Ricketts. Shortly after the commencement of the trial and during a brief recess, Ricketts disclosed to other jurors in the jury room that he knew Carol Franklin and raised the question as to whether he was disqualified to serve as a juror for that reason. He then obtained the attention of the clerk and advised him that he had to take up a matter with the court. Upon being brought before the trial judge, Ricketts stated that Carol Franklin had worked for him over a period of five or six months, a year, or more, prior to the time of the trial, she being one of approximately ten employees. In response to questions by the judge, Ricketts stated that he

did not know Franklin socially; that his relationship with her was entirely a business one, that of employer-employee; and that he did not feel he would be biased in any way whatsoever in the case. The trial judge, after going fully into the relationship and the duration thereof between Ricketts and Franklin, ruled that he was a qualified juror. Both appellants moved for a mistrial and, in the alternative, moved that juror Ricketts be excused from further participation and an alternate juror be seated in his place, which motions were overruled.

In *State v. Hilton,* 87 S. C. 434, 69 S. E. 1077, it was held that a juror who was related by blood within the sixth degree to the state's prosecuting witnesses was not a disqualified juror, the court saying,

"There is no rule of common law, nor is there a statute, disqualifying a juror on account of his relationship to a witness, either by affinity or consanguinity, within any degree."

We think the judge correctly held that Ricketts was not disqualified as a juror and no authority, in point, is cited by appellants in support of the contention that he was disqualified.

Appellants also argue that they were prejudiced because of the fact that Ricketts' connection with Franklin was discussed with the other jurors and communicated to the Clerk of Court. We fail to see where any prejudice could have resulted. It is, of course, well settled that jurors should not, prior to the submission of the case to them, converse among themselves on any subject connected with the trial, or form or express any opinion thereabout. Here, however, there is nothing to indicate any misconduct on the part of Ricketts or anyone else, or prejudice to appellants. In an abundance of conscientious precaution, he simply called to the attention of other jurors that he might be disqualified. He and they thought such should be called to the attention of the judge, and no conversation was engaged in with the clerk except such as was essential to bring the matter to the attention of the judge.

Appellant Wells moved for a new trial on the basis of certain information communicated to counsel for appellant by a juror named Murray as to an occurrence which allegedly took place in the course of the deliberation of the jury, a notice of such motion having been duly served and Murray having been subpoenaed to appear before the trial judge. In response to the subpoena, Murray appeared and testified that in the course of the deliberation juror Ricketts had taken him in the next room and told him, "that he knew Dr. Wells and had dealt with him, and that he was a no good so and so". Murray further testified that Ricketts' statement had changed his opinion about the case and expressed the conclusion that Ricketts' opinion thereabout was based on his prior knowledge about Wells, rather than the evidence in the case. It was not asserted by Murray that the statement allegedly made by Ricketts was made to or in the hearing of any other juror. Ricketts and Murray were not acquainted and Murray offered no suggestion or explanation as to why Ricketts made the statement, if, in fact, he did make it, to Murray alone. He further offered no explanation as to why he, Murray, would allow himself to be influenced by an improper statement allegedly made by a stranger.

While the trial judge heard the testimony of Murray, he afterwards concluded that he was in error in even hearing it. In denying the motion for a new trial predicated on the testimony of Murray, His Honor, in a comprehensive order, reviewed at some length the controlling authorities. We will not lengthen this opinion unduly by reviewing them here. His Honor quoted the following from 39 Am. Jur. 197, New Trial, Sec. 198,

"The testimony or affidavits of jurors, according to the generally recognized practice, will not be received on the hearing of a motion to set aside a verdict on the ground of mistake, irregularity or misconduct on the part of the jury or some one or more of the panel."

In 53 Am. Jur. 769, Trial, Sec. 1105, it is said,

"* * * it is a long-established and generally accepted doctrine, except where modified by statute, that testimony or affidavits of jurors impeaching a verdict rendered by them will not be received where the facts sought to be shown are such as inhere in the verdict."

An unbroken line of decisions in this state is in accord with the foregoing general rules. *Smith v. Culbertson,* 9 Rich. (43 S. C. L.) 106; *State v. Long,* 93 S. C. 502, 77 S. E. 61; *State v. Parris,* 163 S. C. 295, 161 S. E. 496.

Wells also moved for a new trial on the basis of alleged after-discovered evidence, such being based on the affidavit of one Larry Eitel. His affidavit was to the effect that he was an intimate friend of Carol Franklin; that she had told him confidentially that she had had an abortion; that she had gone to Wells and found out he was giving her B-12 shots and that Wells had given her her money back when he found out she wanted an abortion. Further, that her mother found out or knew about Dr. Jones, and had sent her to Dr. Jones, and that Dr. Jones had really butchered her and she was out to get him.

The trial judge denied the motion, and we quote the following from his order,

"The law with respect to after-discovered evidence is set forth in the recent case of *State v. Mayfield,* 235 S. C. 11, 109 S. E. (2d) 716. In that case the Court stated:

'A motion for a new trial on after-discovered evidence is addressed to the sound discretion of the trial court. *State v. Clamp,* 225 S. C. 89, 80 S. E. (2d) 918. And the movant must show that the evidence upon which it is based: (1) is such as would probably change the result if a new trial is had; (2) has been discovered since the trial; (3) could not by the exercise of due diligence have been discovered before the trial; (4) is material to the issue; and (5) is not merely cumulative or impeaching. *State v. Strickland,* 201

S. C. 170, 22 S. E. (2d) 417; *State v. Clamp, supra; State v. Wright,* 228 S. C. 432, 90 S. E. (2d) 492.'

"After careful consideration of this motion, and the supporting affidavit of affiant Eitel, it is the opinion of this court that the motion should be denied. The newly-discovered evidence, in the opinion of the court, would not probably change the result if a new trial were had; and, further, it is merely cumulative and impeaching.

"The credibility of newly-discovered evidence offered in support of a motion for a new trial is a matter for determination by the trial court, who has the power to weigh such evidence. *State v. Mayfield, supra.* The affiant Eitel is employed as a bartender. He has a police record. According to the information furnished by the Federal Bureau of Investigation, this affiant has been arrested or detained on five occasions, namely, on May 21, 1957 at Melbourne, Florida, on a charge of reckless driving for which he forfeited a $35.00 bond; on December 13, 1951 at Titusville, Florida, for driving under the influence; at Chattanooga, Tennessee, on April 5, 1956 on a charge of vagrancy; at Pasadena, Texas, on March 20, 1965 on a charge of drunk and disorderly and carrying a pistol, and at Houston, Texas, on June 18, 1965 on a charge of driving while under the influence and carrying a pistol. He entered a plea of guilty and was sentenced for the offense which occurred in Pasadena, Texas.

"Aside from the question of whether the alleged newly-discovered evidence of the affiant Eitel is credible, the proposed newly-discovered evidence is clearly cumulative and/or impeaching. The principal prosecuting witness, Carol Franklin, testified that she received certain injections or shots from the defendant Wells which were intended to bring on an abortion. Her testimony was denied at the trial by the defendant Wells, and by his employees, Karee Barnwell and Charlotte Brown. They testified that the witness Franklin received B-12 injections or shots from Wells. The affiant Eitel's proposed testimony that the witness

Franklin admitted she received B-12 injections from Wells, would be merely impeaching insofar as the witness Franklin's testimony is concerned, and cumulative as to the testimony of the defendant Wells and the witnesses Barnwell and Brown.

"The additional proposed testimony of the affiant Eitel is that the witness Franklin admitted that her mother, and not the defendant Wells, arranged for the witness Franklin to visit the defendant Jones for an abortion. This proposed testimony is merely impeaching."

The foregoing was a sound disposition by the trial judge and we are satisfied that there was no abuse of discretion on his part. We quote the following pertinent language from *State v. Jackson,* 122 S. C. 493, 115 S. E. 750,

" 'It cannot be said, therefore, that the affidavits must necessarily lead any reasonable mind to the inference that the newly-discovered evidence would probably change the result. Nothing short of this would justify the conclusion that the Circuit Court abused its discretion in refusing the motion.' "

We conclude that all of the appellants' exceptions are without merit, and the judgment of the lower court is, accordingly,

Affirmed.

LEWIS, Acting C. J., BRAILSFORD, J., and LIONEL K. LEGGE and G. BADGER BAKER, Acting Associate Justices, concur.