## Snyder Appeal.

238

Argued November 9, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*Donald J. Goldberg,* with him *Garfield W. Levy,* and *Henry Ginrich,* for appellant.

*Peter F. Cianci,* Assistant District Attorney, with him *Frederick O. Brubaker,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 18, 1960:

Barbara Ann Snyder, 19 years of age, living in Lancaster County, having reason to believe that she was in a state of pregnancy, consulted with a Dr. H. S. Berberian in Lancaster who prescribed pills and hypodermic injections for the purpose of accomplishing a miscarriage. The treatment failing to achieve its objective, he recommended the girl to a Dr. William H. Fisher in Reading, whose attempts to abort her brought on physical distress which sent her to the Lancaster General Hospital in Lancaster. The prosecuting authorities of both Berks and Lancaster Counties investigated the matter and an indictment was brought against Dr. Fisher in Berks County, charging him with an abortion on Barbara Ann Snyder. In Lancaster County an indictment was returned against Dr. Berberian, Barbara Ann Snyder and her sister Dolores Jean Snyder charging them with conspiracy to commit abortion.

At the trial of Dr. Fisher in Berks County, Barbara Snyder, being called as a witness by the Commonwealth, was asked by the District Attorney if she had been a patient in the Lancaster General Hospital in the year 1958. Upon advice of counsel, she refused to answer, asserting the privilege against self-incrimination guaranteed under the Constitutions of the United States and Pennsylvania. The Trial Judge, in the absence of the jury, took testimony which revealed that, prior to the trial, Barbara made a statement in which she disclosed her relations with Dr. Berberian and Dr. Fisher. The Trial Judge now informed her that when she voluntarily made this statement she waived her constitutional privilege protecting her against self-incrimination and that, therefore, she was required to answer the District Attorney's question.

240

Barbara again refused to answer, insisting on her constitutional privilege, whereupon the Trial Court adjudged her guilty of contempt of court and committed her to the Berks County Jail until such time as she purged herself of the contempt. She was only released when (on the following day) she appealed to the Superior Court and a supersedeas issued. The Superior Court affirmed the conviction but on grounds different from those assigned by the Trial Court. We granted allocatur.

The provision of Art. I, §9 of the Constitution of Pennsylvania that one cannot be compelled to give evidence against himself applies to witnesses as well as to accused persons. (*In re Myers and Brei*, 83 Pa. Superior Ct. 383.) And then, the Act of May 23, 1887, P. L. 158, §10, 19 P.S. §631, provides that a witness "may not be compelled to answer any question which, in the opinion of the trial judge, would tend to criminate him."

It was contended by the Commonwealth at the trial that Barbara should have answered the District Attorney's question since it was an innocuous one and could not possibly have incriminated her in any way. The question, however, was not as trifling as the Commonwealth endeavored to make it appear. Barbara, as already stated, was herself under indictment in Lancaster on a charge arising out of the same facts which formed the basis of the Fisher trial. She was thus justified in fearing that her answer might become a link in a chain of admissions which could eventually implicate her in the conspiracy, in which, it was charged by the Commonwealth, she had participated in Lancaster County. If she answered the District Attorney's question in the affirmative, which of course is the only way she could honestly answer it, the succeeding question would inevitably be directed toward ascertaining *why*

she was a patient in the hospital. In fact, without this second question, the first question would have been sheerly meaningless, since it is obvious she could have been a patient for one of a hundred causes, none bearing any relation to the trial of Dr. Fisher on a charge of abortion. Thus, had she answered the first question in the affirmative and the District Attorney had put the inevitable second question: "Why were you in the hospital?" she would have had to divulge that she was there as the result of an abortion, which admission would be formidable ammunition to be used against her in her forthcoming trial in Lancaster County. A witness placed in the situation of responding to questions which can possibly incriminate him must be allowed some latitude in determining whether he should or should not answer.

Addressing himself to this subject in the case of *Adjudication of Contempt of Myers and Brei,* 83 Pa. Superior Ct. 383, President Judge KELLER said: "The privilege extends to the disclosure of any fact which might constitute an essential link in a chain of evidence by which guilt might be established, although that fact alone would not indicate any crime. If the witness was obliged to show how the effect is produced, the protection would at once be annihilated." (p. 390)

In the historical Burr Trial, presided over by the illustrious Chief Justice JOHN MARSHALL, counsel for the United States contended that a witness can never refuse to answer any question unless that particular answer, standing by itself, would acknowledge the commission of a crime. Chief Justice MARSHALL rejected this contention: "This would be rendering the rule almost worthless. Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule, that no witness is compellable to furnish any one of them against himself. It is

certainly not only a possible, but a probable case, that a witness by disclosing a single fact may complete the testimony against himself." (Burr's Trial, Robertson's Rep. I, 244)

As heretofore mentioned, the Trial Judge in the case at bar refused to allow Barbara Ann Snyder the constitutional privilege against self-incrimination because she had made a voluntary statement in which she involved herself in the abortion procedure. In explanation of his position the Trial Judge said: "This statement could clearly be used against the witness in her own trial, on charges pending against her in Lancaster County, if the statement was found to have been voluntarily given. How then could her answer, under oath, as a witness in the present case, more completely incriminate her? The answer is it could not."

But the fact that the statement could be used against her in a subsequent trial did not destroy her constitutional right not to be required to give evidence against herself. The crucial part of any criminal prosecution is the trial where the accused himself is the defendant. It is only at that trial that the culminating issue of guilt or innocence is decided. Section 9, Article I of the Pennsylvania Constitution specifically states: "In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; *he cannot be compelled to give evidence against himself,* nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land." (Emphasis supplied)

The guarantee against self-incrimination is absolute: "He cannot be compelled to give evidence against

himself." This does not refer to any particular place or at any particular time. He may not be *compelled,* under any circumstances, to testify against himself where criminal prosecution is involved. The constitutional privilege is not like a coat which may be taken off and thrown away. It is as much a part of the accused as his skin and may not be stripped away by himself or by others. It is an inviolable power accorded him in exchange for what he surrenders in being a member of the society of the Commonwealth. Of course, he may, if he so desires, testify against himself, but the constitutional privilege continues to remain with him, and the fact that he has willingly admitted circumstances adverse to his own interests can never be made the basis for *compelling* him to make *further* admissions. Even if an accused makes a hundred statements prior to trial he may still refuse to testify against himself at the trial. His constitutional privilege against self-incrimination is inalienable, inviolable and irrevocable. The same is true of all other guarantees in Section 9, Article I of the Pennsylvania Constitution. For instance, a defendant may waive counsel at a preliminary hearing, but this does not deprive him of the right to demand counsel at his trial.

The Trial Judge said in this case: "The Court was of the opinion that the written statement of this witness, given voluntarily after being advised that she need not make a statement and that if she did it would be used in Court, constituted a waiver of her constitutional and statutory rights against self-incrimination, so long as the questions asked of her were confined to those which she had answered in her statement."

In point of precise fact the witness never did state that she waived her constitutional privilege. Before she made the statement referred to by the Judge, the policewoman interrogating her, simply said to her: "It is my duty to warn you however that you do not have

to make this statement and to advise you that the same may be used at some future court proceedings." By no stretch of interpretation may this declaration on the part of the policewoman be regarded as a waiver of constitutional privilege on the part of Barbara Ann Snyder, even if we were to assume that it could be within her volition to waive the constitutional privilege.

Of course, as the Trial Judge observed, and as the policewoman warned Barbara, anything which Barbara said could be used in future court proceedings, but this could not be tortured into an assumption that Barbara had abandoned what the Constitution guaranteed to her and that, from then on, she could be compelled willy-nilly to reply to any hostile question put to her. If the Trial Judge's views were to prevail, it would mean no defendant who confessed to a crime could refuse to take the witness stand at his trial. It would mean that the whole purpose of the constitutional guarantee, won only after centuries of struggle against injustices inflicted through forced confessions, third degree methods, and other barbarous practices of coercion, would be wiped out. To say that the accused is at liberty to speak or not speak prior to the trial but that once having spoken he will be strait-jacketed at the trial is like supplying a combatant with sword and a coat of mail for the preliminary skirmishes and then disarming and stripping him of all protection as he enters the arena to defend his life, liberty, and good name. The constitutional guarantee would become an utter mockery if it could not be utilized at the very moment it is needed most.

The *Myers and Brei* case, supra, is directly illustrative of the principle under discussion. In that case, Brei was a passenger in an automobile driven by one Whalen which struck and killed a pedestrian, Mabel Cook. At the Coroner's Inquest, Brei testified to cir-

cumstances which criminally implicated Whalen. The testimony also disclosed that since the car involved in the accident had been driven in a manner which suggested intoxication at the wheel, Brei himself could be accused of criminal conduct leading up to the death of Mrs. Cook. At Whalen's trial, the Commonwealth called Brei as a witness and directed him to testify as to his whereabouts on the evening of the accident which resulted in the death of Mrs. Cook. Brei refused to answer on the ground that his answers would tend to criminate him. The Court ordered him to answer and when he still refused to do so, he was adjudicated guilty of contempt. The Superior Court reversed the conviction, President Judge KELLER saying: "Nor was it of any import in the case that Brei had testified before the coroner, and all that was desired of him was a repetition of that testimony. Notwithstanding his testimony before the coroner, he could not be compelled to testify to the same matters in court if it tended to incriminate him: Cullen v. Com., 24 Grattan (Va.) 624; Temple v. Com., 75 Va. 892.)

. . .

"We realize fully that the exercise of this privilege may sometimes make it difficult, perhaps impossible, to secure a conviction of crime, and to that extent it may hinder the course of justice; but not more so than the well settled privilege of a defendant in a criminal prosecution not to take the witness stand, or to have his failure to do so not referred to adversely on the trial . . . Constitutional rights are not to be set aside or disregarded whatever may be the effect of such action on a particular case."

The Trial Judge in this case was thus in error in demanding that Barbara answer the question put to her by the District Attorney simply because she had made a previous statement on the subject. The Superior Court saw this error and so declared it when Barbara's

conviction came before it on appeal. But, having declared the Court of Quarter Sessions of Berks County in error, it then proceeded to make an error of its own. While acknowledging that Barbara had not and could not have waived at the trial her constitutional privilege against self-incrimination, the Superior Court said, nevertheless, that she could not rely on the constitutional immunity because the crime for which she was indicted in Lancaster County could not legally be committed by her.

It is true that Barbara could not be legally convicted of conspiracy to commit abortion on herself since she was the victim of that abortion. A person who is robbed cannot be prosecuted on a charge of conspiracy to rob himself. This would constitute a contradiction in terms. "It is well settled in this Commonwealth that a woman who submits herself to a doctor to have an abortion procured, is not an *accomplice* or *particeps criminis*, within the rules governing the testimony of such persons: Com. v. Weaver, 61 Pa. Superior Ct. 571, 580; Com. v. Bell, 4 Pa. Superior Ct. 187, 192, 193; Henry's Pennsylvania Trial Evidence, sec. 466. She is regarded rather as a victim: Com. v. Bricker, 74 Pa. Superior Ct. 234, 239."* : *Commonwealth v. Sierakowski*, 154 Pa. Superior Ct. 321, 327, 35 A. 2d 790.

From the proposition that Barbara must in the end be exonerated from the charge of criminal conspiracy, the Superior Court drew the conclusion that Barbara was not entitled to the guarantee enunciated in Section 9 of Article I of the Pennsylvania Constitution. This conclusion would ascribe to Barbara a knowledge of the law which would surpass that of the policeman who arrested her, the committing magistrate who held her case for court, the district attorney who presented the

---

* The case of *Wells v. Insurance Co.*, 191 Pa. 207, mentioned in the appellant's brief does not hold to the contrary. That case involved the interpretation of *Massachusetts* law.

prosecution against her before the grand jury, the grand jury which indicted her, and the judge in the trial where she was presently a witness.

Throughout the entire proceedings in the Fisher trial which had to do with whether Barbara should be compelled to testify, the declaration was repeatedly made that she was to stand trial in Lancaster on the charge of conspiring to commit abortion. When she was called to the witness stand, her attorney declared in open court: "The charge in Lancaster County grows out of the same facts and circumstances involved in this case. The defendant in this case, Dr. Fisher, and anything that associates her with Dr. Fisher, I think constitutes a link in the charge against her in Lancaster County."

The Trial Judge did not dispute that the facts and circumstances involved in the Fisher case were the same as those which would come up in the Lancaster prosecution against Barbara. Thus, with the very spokesman of the law, the Judge himself, acknowledging that Barbara would be brought to trial in Lancaster County under the indictment there pending against her, how was she to know that in point of *appellate* jurisprudence there was no case against her? How was this 19-year-old girl, physically ill and mentally distraught, to know what the judge, the district attorney, and the attorneys in the case apparently did not know?

Moreover, the use of her constitutional privilege against self-incrimination was not merely academic. The peril she faced was real and not visionary or only problematic. If she had not pleaded her constitutional privilege she would have been tried in Lancaster and, by the use of her testimony in the Fisher case, she could have been convicted and imprisoned. To say that, after the humiliation of a conviction and the hardship of incarceration, she might eventually be exoner-

ated by appealing to the Superior Court, is to make a masquerade of constitutional guarantees. When every avenue of information open to a lay person leads to but one precise, unequivocal standard of conduct, it would be the apogee of unfairness to hold such a person liable to an entirely different standard which was not known even to those officially charged with knowing all the standards. The axiom that ignorance of the law is no excuse is a salutary one because, otherwise, persons charged with crime would have a facile escape from accountability simply by pleading ignorance. But when a person seeking to know the law makes every reasonable effort to ascertain it, when every book on every reachable shelf in the library of human experience tells him the same thing, and when every person officially charged with knowing the law whom he consults informs him that the law is such, Courts will not be so devoid of understanding as to hold the inquiring person to a knowledge which it was beyond him to attain.

As already pointed out, the official representatives of the State, the judge and the district attorney, quite clearly informed Barbara that the constitutional privilege against self-incrimination [aside from the assumed waiver] was available to her because of the pending prosecution against her in Lancaster County. May the State portray to an accused a situation entirely different from the one which is legally extant? To permit such a misleading portrayal is to condone entrapment which, of course, the law should and does abhor. To hold Barbara guilty of contempt under the circumstances here outlined would be to make her a pawn on the chessboard of legalistic equivocation.

The prosecution which Barbara Ann Snyder was facing in Lancaster County was a tangible reality and not a mere theory. It was a physical event coming up on the calendar of time as certainly as the days follow

one another in the inevitable weekly carousel of unde-viating chronology. We repeat the pertinent part of Section 9, Article I of the Pennsylvania Constitution: "In all criminal prosecutions the accused . . . cannot be compelled to give evidence against himself." The edict is explicit and admits of no exceptions. It does not say that "In all criminal prosecutions which shall terminate with conviction and appellate affirmation." It says, without modification, "in *all* criminal prose-cutions." Who can doubt that Barbara Ann Snyder was confronted with a criminal prosecution in every sense and intendment of the phrase? She had been formally indicted by a grand jury and she had been informed by the Court that she was to stand trial. Thus, when she was asked the question, the answer to which could well become a link in the chain of evidence to be used against her in the criminal prosecution in Lan-caster, the Constitution authorized her to refuse to answer it. The Constitution protected her to the ulti-mate in this refusal. Thus, the action of the Trial Court in committing her to jail because she availed herself of what the Constitution guaranteed to her was an act of judicial usurpation without warrant, without law, and without excuse. The order of the Superior Court directing the Court of Quarter Sessions to im-pose a sentence on Barbara Ann Snyder for exercising her constitutional prerogative was also without war-rant and without law.

The orders of both the Court of Quarter Sessions and the Superior Court are reversed and the appellant is discharged.

Mr. Chief Justice JONES, Mr. Justice BENJAMIN R. JONES and Mr. Justice BOK concur in the result.