## Commonwealth *v.* Nathan, Appellant.

Argued September 30, 1971. Before JONES, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Byrd R. Brown,* for appellant.

*Carol Mary Los,* Assistant District Attorney, with her *Robert L. Campbell,* Assistant District Attorney, and *Robert W. Duggan,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE O'BRIEN, December 20, 1971:

Appellant, Gregory Nathan, an eighteen-year-old with a ninth grade education, was convicted of first-degree murder and sentenced to life imprisonment. After the denial of his post-trial motions by a court en banc and entry of the judgment of sentence, appellant filed an appeal. Although appellant, in his brief and oral argument, alleged numerous trial errors, because we find that the statement made by appellant to the police should not have been introduced into evidence, we will not deal with appellant's other allegations. The improper introduction of his statement into evidence, by itself, entitles appellant to a new trial.

The circumstances surrounding appellant's statement are as follows:

Early in the morning of August 29, 1968, Joseph Gatalsky was shot on a downtown Pittsburgh street. On August 31, 1968, appellant, having heard that he was the subject of a police search, voluntarily surrendered to the Wilkinsburg Borough police. Appellant was read certain warnings contained in a printed form prepared by the Wilkinsburg Police Department. The suppression court ruled that these warnings were not in conformity with the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), but that ruling does not concern us here, because appellant was given proper warnings, by the Pittsburgh police en route to the City of Pittsburgh Public Safety Building, and the court ordered that any statements made prior to his arrival there should be suppressed. Since the subsequent statements which appellant made to the Pittsburgh police were in no way tainted by the statements appellant had made to a Wilkinsburg police officer, of which statements the Pittsburgh police were not even aware, the inadequate warnings which

appellant received in Wilkinsburg did not render the later statements inadmissible. *Commonwealth v. Marabel,* 445 Pa. 435, 283 A. 2d 285 (1971), *Commonwealth v. Frazier,* 443 Pa. 178, 279 A. 2d 33 (1971).

After appellant was given the proper warnings by a member of the Pittsburgh Police Department, he requested an attorney. Since appellant had no particular attorney in mind, he was shown a list of members of the Allegheny County Bar who handle criminal cases. From this list, appellant picked Byrd R. Brown, Esquire, and the police officers promptly placed a call to Mr. Brown's office, where they learned from his answering service that he was not in. Once the request for counsel was made, the calls placed and counsel found to be unobtainable, the police did not attempt any interrogation.

Appellant was then removed from the Homicide Bureau to the "bull pen" in another part of the Public Safety Building. The two Pittsburgh police officers who had accompanied the appellant to Pittsburgh from Wilkinsburg and who were present when the warnings were read, and had attempted to reach Mr. Brown, then departed the scene to perform other duties.

A short time later, Detective Terscak, who had been called at home, informed that appellant was in custody, and asked to report to headquarters, came on duty. He promptly went to the "bull pen" and then accompanied appellant back to the Homicide Bureau, which was, by this time, otherwise unoccupied.

According to Officer Terscak, after advising appellant of his rights by reading them from the police form, Terscak proceeded to ask appellant whether he wished to make a statement. Appellant informed the officer that he had attempted to call Attorney Brown, but that "he was out of town." The officer then asked appellant whether he was "willing to talk about the case without Mr. Brown being present."

According to Officer Terscak, he specifically asked appellant "In view of the fact that you couldn't get hold of Mr. Brown, or Mr. Brown was not available, are you now willing to answer our questions without Mr. Brown or any other attorney?" and appellant said he was.

Appellant claimed that when Officer Terscak brought him from the "bull pen" to the homicide office, he was first shown a statement made by Tracy Morgan, the girl who was with him at the time the murder occurred, and he got angry and decided to give a statement, too, because "she put everything off on me." When Officer Terscak was asked whether he had ever showed appellant Tracy Morgan's statement, he couldn't recall but he admitted that he "might have."

Appellant also claimed that the officer told him that a "statement can help you and hurt you, and sometimes its good to give one and sometimes not." Officer Terscak admitted that he gave appellant this "advice." According to the officer, "I usually tell it to everyone. I don't see nothing (sic) wrong with that."

Appellant argues that the admission of his statement made in these circumstances was a denial of his constitutional right to counsel as enunciated by the United States Supreme Court in *Miranda v. Arizona, supra.* After explaining that in order to protect an individual's Fifth Amendment privilege, he must have the right to have counsel present at the interrogation, because "[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators," *Miranda, supra,* at page 469, the court held that an individual must be informed that he has the right to consult with a lawyer and to have a lawyer present during any interrogation.

The court then went on as follows:

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.

. . . .

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. Illinois, 378 U.S. 478, 490."

The court went on to explain that ". . . any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation."

When appellant told the Pittsburgh police that he wanted an attorney, the interrogation properly ceased. It should not have resumed until Mr. Brown had been located and had consulted with appellant. See *Commonwealth v. Leaming,* 432 Pa. 326, 247 A. 2d 590 (1968). The fact that Officer Terscak did not know

the details concerning the attempt on the part of the Pittsburgh police to locate Mr. Brown for appellant makes no difference. His fellow officers should have noted appellant's exercise of his rights and his request for Mr. Brown on appellant's folder. Appellant effectively exercised his constitutional privilege to have an attorney present during interrogation. In order for the Commonwealth to use a statement made after appellant indicated a desire to exercise his rights, it has, in the words of the *Miranda* opinion, the "heavy burden" of "[demonstrating] that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel . . ." without being "threatened, tricked, or cajoled" into the waiver.

We need not determine whether Officer Terscak did show appellant the confession of his codefendant to find evidence that appellant was cajoled into waiving his rights after he had chosen to exercise them and had validly done so. See *People v. Fioritto,* 68 Cal. Rptr. 817 (1968). When Officer Terscak told appellant that "sometimes it is good to give a statement and sometimes not," he was engaging in a practice similar to that which we condemned in *Commonwealth v. Singleton,* 439 Pa. 185, 266 A. 2d 753 (1970), where the authorities told the defendant that any statement made by him could be used *"for* or against him." (Emphasis supplied)

As we explained in *Singleton*: ". . . the inclusion of [the word for] acts as a subtle inducement to speak, helps neutralize the suspect's awareness of the hostile environment, and vitiates the intended impact of the warning. . . . In stating its reasons for requiring the warning about the future use of any statements, the [Miranda] Court said: '[t]his warning is needed in order to make . . . [the suspect] aware not only of the

privilege, but also the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.' " (At pages 190-91).

The Commonwealth, admitting the impropriety of the words used by Officer Terscak, argues that since appellant was also given a correct statement of the warnings, this case is controlled by *Commonwealth v. Camm*, 443 Pa. 253, 277 A. 2d 325 (1971).

However, we are dealing with a different issue than we dealt with in *Camm*. In the instant case, unlike *Camm,* appellant exercised his privilege. He requested counsel and refused to make a statement without counsel being present. For the Commonwealth to persuade the court that appellant, after exercising his privilege, changed his mind voluntarily, it has the burden of showing that appellant's change of mind occurred without his being "threatened, tricked, or cajoled." Here, since the officer admitted that he told appellant that a statement might help him, the Commonwealth failed to meet its burden.

Judgment of sentence reversed and case remanded for new trial.

Mr. Justice JONES dissents.

Mr. Chief Justice BELL and Mr. Justice BARBIERI took no part in the consideration or decision of this case.