## Commonwealth *v.* DuVal, Appellant.

206

Argued January 17, 1972. Before JONES, C. J.,
EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MAN-
DERINO, JJ.

*Bernard L. Segal,* for appellant.

*Stephen B. Harris,* Assistant District Attorney, with him *Ward F. Clark,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE POMEROY, July 2, 1973:

Appellant George DuVal was convicted by a jury in 1968 of the crime of voluntary manslaughter and, following denial of post-trial motions, was sentenced to a term of six to twelve years. This direct appeal comes to us under the Act of March 31, 1860, P. L. 427, §57, 19 P.S. §1182.

Five reasons are advanced why appellant's conviction cannot stand. One of the five—that the Commonwealth erred in not including a charge of involuntary manslaughter in the bill of indictment presented to the grand jury—was not presented to the court below by post-trial motion and under settled principles will not now be decided by this Court. Of the remaining four reasons, one will in fact require that appellant's conviction be reversed. We will additionally reach and decide two of the remaining three contentions because they are almost certain to recur should the Commonwealth elect to retry appellant.

I. Invocation of the Privilege Against Self-Incrimination by the Witnesses McCabe and D'Ulisse

The victim of the crime, Phillip C. Springbett, Jr., was shot while visiting at the Levittown, Pennsylvania home of George DuVal, the defendant-appellant, and his mistress, Marilyn D'Ulisse. It was the Commonwealth's theory that Springbett had traveled to Levittown to effect a reconciliation with his mistress, Joan McCabe, with whom he had recently had a falling out and who had temporarily taken up residence with the defendant DuVal and Miss D'Ulisse. According to the Commonwealth, relations between Springbett and Miss McCabe deteriorated still further during Springbett's visit and while all four persons were together in the kitchen in the late afternoon, Springbett struck Joan McCabe in anger. This action so infuriated DuVal that he fetched a .45 calibre service revolver from the bedroom, returned to the kitchen and shot Springbett in the chest.

Answering a call for assistance placed by one of the two women, the local Rescue Squad appeared on the scene to find Springbett lying near death and to observe a man exiting the house and driving away. No member of the Rescue Squad was able to identify the defendant DuVal as that man. The murder weapon was found in a vacant lot along the road leading away from the DuVal/D'Ulisse residence.

At the preliminary hearing, at the Grand Jury proceedings, and during a habeas corpus hearing concerning defendant's bail, the two women witnesses to the shooting testified. Originally their explanation had been that an unknown burglar had entered the house and had murdered Springbett. Later, before the Grand Jury, both of them changed their stories to that detailed above. Between the time of the Grand Jury testimony

and the start of DuVal's trial, however, both women became concerned that perjury charges might be in the offing and they consulted a lawyer. That attorney contacted the assistant district attorney of Bucks County "three or four days before the beginning of the voir dire." In a hearing held after the trial on defendant's motion to supplement the record, the assistant district attorney recounted the conversation as follows:

"[He (the attorney of McCabe and D'Ulisee)] came up to me and said, 'I want you to know that I intend not to permit the girls to take the stand on trial.'

"I said, 'Do you represent them?' Because it stuck in my mind that they were represented by another attorney at the time.

"I don't recall what [his] answer was, but I believe that I elicited from him that he had not yet entered his appearance for them.

"And I said that—I said to him that, 'I don't know how to take what you're saying, because as I understand what you are saying, it is your intention that they not take the stand in the trial, but I do not know what their intention is, and I'll not know what their intention is, until their intention is tested.'

"And then I reminded him of the fact that I was aware of the fact that they had testified at the preliminary hearing, one of them had testified at the Grand Jury, and two of them had testified at a habeas corpus hearing.

"I said to him, in very clear terms, that as far as I was concerned, these young women had waived their privilege, but in any event, whether they would or would not invoke this privilege at trial, I would wait and have to abide that moment." The assistant district attorney then stated that he related the substance of the above quoted conversation to the district attorney.

On the first day of the trial, the Commonwealth called Joan McCabe, at which time her lawyer (the same person who had previously spoken with the assistant district attorney) introduced himself to the court and entered an appearance on behalf of the witness, thereby eliminating whatever doubts may have existed in the mind of the district attorney as to whether in fact he represented Miss McCabe. When called to the stand, Miss McCabe would state nothing but her name and address, and to all else claimed her Fifth Amendment privilege against self-incrimination. Out of the hearing of the jury, the trial judge decided that the witness had waived her privilege by testifying on prior occasions. The jury was returned and the witness was directed to testify. She refused, was declared in contempt of court, and was led off in the custody of the sheriff. Defense counsel made objection throughout.

Miss Marilyn D'Ulisse was then called, the same attorney entered an appearance on her behalf, and the same events followed as with the witness McCabe. Miss D'Ulisse also was escorted from the courtroom by the sheriff. Again defense counsel made timely objection.

We view the above as reversible error under our recent decision in *Commonwealth v. Terenda*, 451 Pa. 116, 301 A. 2d 625 (1973).[1] In that case it was held, in accord with the prevailing law in many jurisdictions,[2] that

---

[1] The opinion in *Terenda* spoke for only three members of the Court, but the entire Court concurred in the result, and no other issues were presented. See also *Commonwealth v. Camm*, 443 Pa. 253, 265, 277 A. 2d 325 (1971) ("There are cases where the prosecution has called a witness, knowing beforehand he would claim the privilege, and then attempted to supplement the state's case by inferences drawn from the witness' silence").

[2] See, e.g., *United States v. Harding*, 432 F. 2d 1218 (9th Cir. 1970) ; *Fletcher v. United States*, 332 F. 2d 724 (D.C. Cir. 1964) ; *San Fratello v. United States*, 340 F. 2d 560 (5th Cir. 1965) ; *United States v. Compton*, 365 F. 2d 1 (6th Cir.), cert. denied, 385 U.S.

it is prejudicial error for a prosecutor to summon a witness to the stand in a criminal trial with foreknowledge that the witness intends to invoke a privilege against self-incrimination. The opinion in *Terenda* emphasized the risk that the jury would draw adverse inferences against the defendant; we take the present occasion to add further explanation as to why inferences drawn from a refusal of a witness who is not a defendant are improper.

Although appellant frames his argument in terms of the Due Process Clause of the Fourteenth Amendment, we note that no jurisdiction in which a procedure such as that set out above has been condemned as error has done so on constitutional grounds. Indeed, on the only occasion on which the Supreme Court of the United States has considered the propriety of such conduct, the Court emphasized that "[n]o constitutional issues of any kind are presented," and that "[a]ll . . . this case involves, in short, is a claim of evidentiary trial error." *Namet v. United States,* 373 U.S. 179, 185, 10 L. Ed. 2d 278 (1963). But see *Pointer v. Texas,* 380 U.S. 400, 13 L. Ed. 2d 923 (1965); *Douglas v. Ala-*

956, 17 L. Ed. 2d 303 (1966); *Sanders v. United States,* 373 F. 2d 735 (9th Cir. 1967); *Namet v. United States,* 373 U.S. 179, 10 L. Ed. 2d 278 (1963); *United States v. Tucker,* 267 F. 2d 212 (3d Cir. 1959); *United States v. Maloney,* 262 F. 2d 535 (2d Cir. 1958); *Richardson v. State,* 246 So. 2d 771 (Sup. Ct. Fla. 1971); *State v. Cullen,* 103 N.J. Super. 360, 247 A. 2d 346 (1968); *People v. Zachery,* 31 App. Div. 2d 732, 297 N.Y.S. 2d 183 (1968); *People v. Myers,* 35 Ill. 2d 311, 220 N.E. 2d 297, cert. denied, 385 U.S. 1019, 17 L. Ed. 2d 557 (1967); *Vandergrift v. State,* 237 Md. 305, 206 A. 2d 250 (1965); *State v. Dinsio,* 176 Ohio St. 460, 200 N.E. 2d 467 (1964); *State v. Johnson,* 413 P. 2d 383 (Sup. Ct. Ore. 1966); *De Gesualdo v. People,* 364 P. 2d 374 (Sup. Ct. Colo. 1961); *Commonwealth v. Granito,* 326 Mass. 494, 95 N.E. 2d 539 (1950). See generally Anno., Prejudicial Effect of Prosecution's Calling as Witness, to Extract Claim of Self-Incrimination Privilege, One Involved in Offense with which Accused is Charged, 86 A.L.R. 2d 1443 (1962).

*bama,* 380 U.S. 415, 13 L. Ed. 2d 934 (1965); *Bruton v. United States,* 391 U.S. 123, 20 L. Ed. 2d 476 (1968), where the Sixth Amendment right to confront witnesses, made applicable to the states by the Fourteenth Amendment, was held violated by procedures which permitted the jury to learn the substance of uncross-examined, extrajudicial statements of alleged co-felons. The prejudice to the defendant of statements placed before the jury which by their terms directly connect him with the crime (as in *Pointer, Douglas* and *Bruton,* supra) is of a different order from the prejudice present in the case at bar. Here the risk is not that the jury will misuse evidence which directly states that the defendant is the criminal, but rather that the jury will make improper inference from the mere refusal of the witness called to testify at all. Here, unlike *Pointer, Douglas* and *Bruton,* supra, the witnesses McCabe and D'Ulisse have made no statement, written or oral, before the jury that directly implicates DuVal; they have said nothing at all. Whether or not the error which we find to have occurred in this case is error under the federal constitution as well is a question which it is not necessary for us to reach on this appeal.

It is clear beyond question that no inference can be taken against the person invoking the privilege. *Griffin v. California,* 380 U.S. 609, 14 L. Ed. 2d 106 (1965). Although it could be argued that under certain circumstances a refusal to testify on grounds of self-incrimination might have probative value in establishing an issue in a matter to which the witness was not a party, we have recently held that it is not permissible for either defense or prosecution to attempt to capitalize on such refusal. *Commonwealth v. Greene,* 445 Pa. 228, 285 A. 2d 865 (1971). Where it is the prosecutor who attempts to use such a device, there is a special vice: the inference to be drawn from the refusal to testify

of the defendant's co-defendant, accomplice or associate has *no probative value whatsoever* in establishing the guilt of the defendant. It is rather an effort to cause the jury to think "guilt by association."

In the case at bar the appellant and the two women, McCabe and D'Ulisse, were known by the jury (evidence having been introduced to that effect) to have been present in the room in which Springbett was shot and killed. Accepting that these three persons were likely to be associated in the minds of the jury as a class, and accepting that McCabe and D'Ulisse may have had a criminal responsibility arising from the death of Springbett (because they invoked the Fifth Amendment),[3] it is a logical fallacy to infer that Du-Val, the remaining member of the class, also must have a criminal responsibility for the death of Springbett; it would be as illogical to conclude that DuVal was a woman, a characteristic possessed by the other two members of the class. The procedure followed by the prosecution here and permitted by the lower court over objection is to be condemned, therefore, because without any justification apparent in the record it presented the jury with an irrelevant event (invocation of the privilege) from which the jury could make fallacious deductions prejudicial to the defendant and not subject to cross-examination.[4]

The Commonwealth argues, however, as it did not in *Terenda,* supra, that it acted in good faith because it honestly believed that the claim of privilege of which it had been forewarned would not be legally sustain-

---

[3] It should be noted that this assumption is in this case probably incorrect. The two witnesses did not fear prosecution for the killing of Springbett; they feared prosecution for perjury.

[4] It is the first axiom of the law of evidence that "none but facts having rational probative value are admissible." I J. Wigmore, Law of Evidence §9, at 289 (1940).

able, as the two women, according to the Commonwealth, had waived their privilege by testifying on prior occasions.[5] There are two answers to that contention:

*First*: The Commonwealth's theory of waiver of the privilege against self-incrimination is directly contrary to the existing law of this State on the subject. *Snyder Appeal*, 398 Pa. 237, 157 A. 2d 207 (1960).[6] While that decision is not universally acclaimed,[7] it has not

---

[5] All jurisdictions have found the good faith of the prosecutor in believing either that the witness would testify, e.g., *State v. Mitchell*, 268 Minn. 513, 130 N.W. 2d 128 (1964) ; *State v. Fournier*, 91 N.J. Super. 477, 221 A. 2d 225 (1966) ; *DeGesualdo v. People*, 364 P. 2d 374 (Sup. Ct. Colo. 1961), or could be compelled to testify, *United States v. Edwards*, 366 F. 2d 853 (2d Cir. 1966) ; *State v. Nelson*, 65 Wash. 2d 189, 396 P. 2d 540 (1964), to be sufficient reason to find no error in calling a witness who thereafter successfully invoked the Fifth Amendment. See Anno., 86 A.L.R. 2d 1443, 1455 (1962).

[6] In *Snyder Appeal*, supra, we held that a witness at a criminal trial (not the defendant) could invoke her Fifth Amendment privilege notwithstanding the fact that she had testified as to the matter in question in preliminary proceedings. We there said that "the constitutional privilege continues to remain with him [a witness], and the fact that he has willingly admitted circumstances adverse to his own interests can never be the basis for *compelling* him to make *further* admissions." 398 Pa. at 243.

All the cases cited to us by the Commonwealth as supporting a result contra to that of *Snyder Appeal* in fact pre-date that case. (In addition they are decisions by courts of original jurisdiction or of intermediate appeal.)

[7] Professor McCormick characterizes our decision in *Snyder Appeal*, supra, as "mechanical." See McCormick, Handbook on the Law of Evidence §130, at 274 (1970). In the absence of controlling precedent in the United States Supreme Court, recent decisions dealing with the problem of waiver of Fifth Amendment rights against self-incrimination have adopted the contrary views of the American Law Institute's Model Code of Evidence, Rule 231, at 169 (1942), and of the Uniform Rules of Evidence, Rule 37, 9A U.L.A. 621 (1965). See, e.g., *Ellis v. United States*, 416 F. 2d 791 (D.C. Cir. 1969) ; *In re De Saulnier*, 276 N.E. 2d 278 (Sup. Ct. Mass. 1971).

been the theory of the Commonwealth below or on appeal that the moment has come to reconsider it. In fact, the Commonwealth in its brief has not mentioned the case.

*Second*: We disagree with those jurisdictions in which it is held that the prosecution may with impunity call before the jury a witness likely to be associated with the defendant in the minds of the jurors, knowing that a privilege against self-incrimination will be claimed and yet believing that the claim of privilege will be legally invalid. It is a simple matter for the prosecuting attorney to inform the court that a witness he intends to call will, to his knowledge, attempt to invoke a privilege against testifying, and obtain a ruling thereon. We note that such a procedure is proposed by the American Bar Association's Project on Standards for Criminal Justice: "A prosecutor should not call a witness who he knows will claim a privilege not to testify, for the purpose of impressing upon the jury the fact of the claim of privilege. In some instances, as defined in the Code of Professional Responsibility, doing so will constitute unprofessional conduct." ABA, Standards Relating to the Prosecution Function and the Defense Function §5.7(c), at 122-23.[8] In a comment to this section, the Project pointed out that "if the prosecutor is informed in advance that the witness will claim a privilege and he wishes to contest the claim, the matter should be treated without the presence of the jury and a ruling obtained." Id. at

---

[8] It is not without significance that this section in the tentative draft read: "It is unprofessional conduct for a prosecutor to call a witness who he knows will claim a *valid* privilege . . . ." (Emphasis added). During the debate in the House of Delegates of the ABA on February 8, 1971, however, and prior to approval, the word "valid" was deleted by amendment.

125. The witness' known intent to invoke the privilege coupled with the prosecutor's opinion that the testimony sought can be nevertheless compelled presents the risk that, as actually occurred twice in the case at bar, the witness might prove not only reluctant to testify but contumacious as well. If the fact of invocation of the privilege is, as we believe, irrelevant to the issues and prejudicial to the defendant, it is that much more prejudicial to permit the jury to observe that the recalcitrant witness (a person likely to be associated in the jurors' minds with the defendant) elects to remain silent notwithstanding the order of the court that he testify.

In the case at bar it would have been a simple matter indeed, with the jury already removed from the courtroom, to determine whether the witnesses D'Ulisse and McCabe would continue to assert a privilege despite the contrary ruling by the court. Permitting the jury to return to the courtroom and then to observe first McCabe and then D'Ulisse being cited for contempt and marched out in the custody of the sheriff was prejudicial to the defendant.[9]

We therefore hold that the prosecution, once informed that a witness intends to claim a privilege against self-incrimination, commits error in calling that witness to the stand before the jury where the witness is a person (co-defendant, accomplice, associate, etc.) likely to be thought by the jury to be associated with the defendant in the incident or transaction out of which the criminal charges arose. Whether or not the prosecution has a good faith belief that the assertion

---

[9] Counsel for the witnesses pointed this fact out to the court: "If your Honor please, I don't know if this [citation for contempt/removal by the sheriff] should be done with the jury present." The court agreed that "[i]t should not be."

of privilege is legally invalid is irrelevant; that matter can be settled outside the hearing of the jury.[10]

No cautionary instruction was given to the jury as to claim of privilege by the two witnesses, nor was any requested. The Commonwealth argues that the failure to make such a request precludes appellant from asserting the error we have previously held to have occurred. The *Terenda* opinion, supra, called ineffective the trial court's attempt to cure error of this sort by instructing the jury to disregard the fact that co-defendants had been called to the stand and had invoked the Fifth Amendment right against self-incrimination. Whether or not prejudicial error can be cured by appropriate instructions can be answered only through an objective evaluation of the capability of the average juror to follow the instruction and thus refrain from misuse or use of evidence improperly admitted. See generally, Note, The Limiting Instruction—Its Effectiveness and Effect, 51 Minn. L. Rev. 264 (1956). Where an element of prosecutorial misconduct is present, as it is here and as it was in *Terenda*, we prefer to give the defendant the benefit of the doubt as to whether or not the error could have been cured by an instruction. We thus hold that the prejudicial error here involved was not waived by failure of defense counsel to request an instruction. It follows that appellant's conviction cannot stand, and that a new trial must be ordered.

---

[10] As it is clear in the case at bar that the Commonwealth's attorneys had actual notice of the intent of the two, McCabe and D'Ulisse, to invoke the privilege, we do not reach the question whether and under what circumstances a prosecutor has a duty to make advance inquiry as to the willingness of a witness to testify. Cf. *Mathis v. State*, 469 S.W. 2d 796 (Tex. Crim. App. 1970) (error in calling co-indictee without knowing whether he would testify); *De Gesualdo v. People*, 364 P. 2d 374 (Sup. Ct. Colo. 1961) (same).

## II. Admissibility of Statements Made to a Prison Guard

The killing of Springbett occurred on December 12, 1967. DuVal surrendered to police authorities in the office of his lawyer on the late afternoon of December 14th. Testimony of the arresting officer establishes that DuVal was read the arrest warrant, was read the *Miranda* warnings from a card which he subsequently signed, and was then removed from the attorney's office. It was made clear to the arresting officer by appellant's lawyer, however, that no interrogation of DuVal was to take place at all. Consequently, the defendant was taken to the Bristol Township Building, was there fingerprinted and arraigned before a Bucks County magistrate, and was then delivered into the custody of the officials of the Bucks County Prison.

On the afternoon of the third day of trial, two days after the witnesses McCabe and D'Ulisse had invoked the Fifth Amendment privilege, the Commonwealth informed defense counsel that it had located a witness, James W. Doorly, who would testify to incriminating statements made by the defendant DuVal.[11] Doorly was a prison guard on the late afternoon to midnight shift. It was he who checked DuVal into the prison on the evening of December 14 at approximately 6:30 p.m. According to Sergeant Doorly, while he was filling out a required form, DuVal, without prompting and in response to no question asked by Doorly, spontaneously declared: "I shot this guy. He was beating up the girl, and it was my home." This testimony, of

---

[11] Appellant alleges error in the refusal of the lower court to grant defense counsel a continuance of more than one morning to prepare cross-examination of the witness Doorly. We will not reach this contention because the defendant will, following our decision today, have adequate time to prepare.

course, converted what had begun to appear to be a weak circumstantial case into one in which the defendant had in effect confessed to the crime. Defense counsel moved to suppress this statement on the ground that it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966).

Appellant contends that the "intake" process in which Sergeant Doorly was involved is a custodial interrogation within the meaning of *Miranda*, that no warnings were given to DuVal by Sergeant Doorly, and that hence any statement thus elicited from DuVal was obtained in violation of his constitutional rights. *Miranda* warnings had been given to DuVal by the arresting officer less than two hours before. We regard these warnings as sufficient in view of the short lapse of time. *Commonwealth v. Hoss*, 445 Pa. 98, 111-12, 283 A. 2d 58 (1971). The argument necessarily becomes, then, that DuVal, who was informed of his constitutional rights and who, through his lawyer, had indicated a desire to exercise his absolute right to remain silent, was nonetheless "interrogated" by Sergeant Doorly.

It is clear that under the circumstances no interrogation of DuVal was permissible. *Miranda*, supra, 384 U.S. at 474; *Commonwealth v. Nathan*, 445 Pa. 470, 285 A. 2d 175 (1971); *Commonwealth v. Leaming*, 432 Pa. 326, 247 A. 2d 590 (1968). We have defined "interrogation" under *Miranda* as encompassing "any question likely to or expected to elicit a confession." *Commonwealth v. Simala*, 434 Pa. 219, 227, 252 A. 2d 575 (1969). We have, however, never read *Miranda* as requiring all subsequent statements made by the defendant to be suppressed. If the defendant, without prodding or inducement by the police which amounts to interrogation, spontaneously confesses or blurts out incriminating statements, those statements are admissible. *Miranda*, 384 U.S. at 478, 16 L. Ed. 2d 694 (1966); *Commonwealth v. Simala*, supra, 434 Pa. at 225; *Common-

*wealth v. Feldman*, 432 Pa. 428, 248 A. 2d 1 (1968); *Commonwealth ex rel. Vanderpool v. Russell*, 426 Pa. 499, 233 A. 2d 246 (1967); *Commonwealth v. Eperjesi*, 423 Pa. 455, 224 A. 2d 216 (1966). We think that this statement made to Sergeant Doorly was not the product of interrogation, but rather was volunteered.

According to the testimony of the prison guard, which the lower court credited, DuVal had been asked his name, his marital status, his religion, his occupation, and his address for purposes of completing a summary card. Sergeant Doorly then put down the summary card and picked up a form called an arrest report to which was attached a commitment form. This latter form had already been completed by the magistrate before whom DuVal had been arraigned, and it indicated that the arrested man was held for homicide. Although the arrest report, which was blank, contained a space for "charge" to be indicated, Sergeant Doorly testified that he did not ask DuVal the nature of the charges against him, but rather set about transferring the data on the commitment form to the arrest report. In the silence DuVal made the declaration quoted above: "I shot this guy, he was beating up the girl, and it was my home."[12]

We recognize the legitimate need of the police and of prison authorities to process even those persons who have claimed their rights under *Miranda* and hence we cannot and do not proscribe all police-prisoner contact or conversation. We have recognized, however, that

---

[12] The lower court may have been disposed to believe Sergeant Doorly's account of the volunteered statements because the arresting police officers testified that en route to the township building and while being fingerprinted, DuVal made the following statements: "I will never pick up another gun as long as I live. Don't write that down"; "Guns bring you nothing but trouble. I'll never touch another gun again." Appellant denied making any such statements, but does not now question their admissibility.

subtle pressures—later said to have been "administrative"—can be applied to encourage or elicit incriminating statements, and we will look carefully to determine whether *Miranda* rights have been violated. See *Commonwealth v. Mercier*, 451 Pa. 211, 302 A. 2d 337 (1973); *Commonwealth v. Hamilton*, 445 Pa. 292, 285 A. 2d 172 (1971). Sergeant Doorly's questions were not such as to be "likely . . . to elicit a confession"; indeed, the guard thought so little of the incident and viewed his role as so apart from the crime solving role of the police that he never reported it to his supervisors. We conclude that the challenged statements were properly admitted.

### III. Admissibility of Color Slides

The victim of the crime was fatally wounded by a bullet from a .45 caliber service revolver, the projectile having entered in the center of the chest and having exited midway up the deceased's back. During the autopsy, fifteen photographs were taken, nine before any incisions had been made and six during and after the internal investigation. In none of the first nine is there any evidence of blood or viscera; instead it is obvious that care was used to clean the corpse prior to photographing it so that the resulting pictures would show only the external indications of the bullet wound, a wound which appears at both entry and exit points as a small circular puncture. The Commonwealth offered all fifteen slides into evidence, but, after timely objection by defense counsel, the trial judge examined the series and ruled that most were inadmissible. Of those ruled admissible, the Commonwealth actually introduced only three: one of the nude upper torso of the deceased, including the head; one of the upper back of the deceased, and one of the upper torso from the side with metal rods projecting from the two wounds, indi-

cating the path of the bullet from front to back. The slides were shown to the jury for a total of six minutes and twenty seconds, and were not sent out with the jury.

The general principles in this branch of evidentiary law are well settled. In *Commonwealth v. Powell*, 428 Pa. 275, 278-79, 241 A. 2d 119 (1968), we set forth the test of admissibility of photographs of the deceased as being "whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." Application of that test is "primarily within the discretion of the trial judge," *Powell*, supra, at 278, and we will not reverse unless the lower court flagrantly abused that discretion. *Commonwealth v. Biebighauser*, 450 Pa. 336, 300 A. 2d 70 (1973) ; *Commonwealth v. Smalls*, 449 Pa. 15, 295 A. 2d 298 (1972) ; *Commonwealth v. Chasten*, 443 Pa. 29, 275 A. 2d 305 (1971). This is so because determination of the risk of prejudice cannot be made by resort to conclusory adjectives such as "gruesome" or "inflammatory," but instead must result from an objective evaluation of how the evidence offered will affect the thinking of the average juror. There is wisely no rule that a photograph of a corpse is, without more, "gruesome" or "inflammatory," and the admissibility of a color slide of a murder victim has been held to be affected by the manner in which the photograph was made. *Commonwealth v. Collins*, 440 Pa. 368, 371, 269 A. 2d 882 (1970) (excess blood removed from decedent's face).

We find ourselves, after viewing the three slides admitted at trial, in agreement with the lower court, which held that "these slides were not particularly bloody, gruesome or repulsive, except to the extent that any photograph of a deceased person is unpleasant." The situation at bar is close to that in *Commonwealth v. Wilson*, 431 Pa. 21, 32, 244 A. 2d 734 (1968), *cert. de-*

*nied,* 393 U.S. 1102, 21 L. Ed. 2d 794 (1969), where we observed that the slides were probative of an element in the Commonwealth's case (use of a deadly weapon on a vital part of the body as permitting an inference of malice), were "not nearly so gruesome and inflammatory as were the photographs in Eckhart (Commonwealth v. Eckhart, 430 Pa. 311, 242 A. 2d 271 (1968) )," and that "[t]he court below clearly exercised . . . discretion, taking care to limit any prejudicial effect the slides might have had. Although the Commonwealth sought to introduce five slides, the court admitted only three, excluding one as being repetitious, and a second as being too inflammatory. The three slides admitted were shown for a total of less than two minutes and did not go out with the jury." We therefore think the lower court cannot be charged with abuse of discretion in having admitted these three slides into evidence.

The judgment of sentence is reversed and the case is remanded for a new trial.

Mr. Justice MANDERINO concurs in the result.

Mr. Chief Justice JONES dissents.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I agree that appellant is entitled to a new trial because the trial court, over timely objection, erroneously permitted the prosecutor to call witnesses who the prosecutor knew would assert the privilege against self-incrimination.

In view of the grant of a new trial on the above ground, I fail to see the need or wisdom in presently discussing—as does the majority—the admissibility of either appellant's statement or the color slides. If in the future these issues are presented to the Court and are necessary for decision, that will be the appropriate time for resolution of those issues.

Mr. Justice NIX joins in this concurring opinion.