**[J-78-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 31 WAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered December |
| | : | 28, 2023, at No. 1480 WDA 2021, |
| v. | : | Affirming the Order of the Court of |
| | : | Common Pleas of Erie County |
| | : | entered August 14, 2020, at No. CP- |
| JERMAINE BELGRAVE, | : | 25-CR-001015-2019 and |
| | : | remanding. |
| Appellant | : | |
| | : | ARGUED: October 7, 2025 |

**OPINION**

**JUSTICE WECHT**                                         **DECIDED: MARCH 26, 2026**

"As an officer of the court," this Court has observed, a "prosecutor has the responsibility to serve the public interest and to 'seek justice within the bounds of the law, not merely to convict.'"[1] "The prosecutor must ensure that 'the defendant is accorded procedural justice'" and "'that guilt is decided upon the basis of sufficient evidence.'"[2] In this case, a prosecutor exceeded the bounds established in prior case law, and he did so with the trial court's blessing. As in those earlier cases, we cannot disentangle the

---

[1]     *Commonwealth v. Clancy*, 192 A.3d 44, 52 (Pa. 2018) (quoting *Commonwealth v. Starks*, 387 A.2d 829, 831 (Pa. 1978)).

[2]     *Id*. at 52-53 (quoting Pa.R.P.C. 3.8 cmt. 1).

prosecutor's conduct from the verdict. Consequently, we reverse the Superior Court's order affirming Jermaine Belgrave's judgment of sentence.

The underlying facts as related by the Superior Court are as follows:

The charges against [Belgrave] arise from a sale of drugs at a hotel in Erie, Pennsylvania on February [7], 2019, that ended in a gunfight. The Commonwealth presented its evidence at trial through the testimony of Erie police officials and evidence gathered during their investigation. The evidence demonstrates that on February 7, 2019, four males, including [Belgrave], drove from Chicago, Illinois to Erie, Pennsylvania. On the same date, one of the four men, Sheldon Morales, rented a room at a Marriott Hotel in Erie with a checkout date of February 9, 2019. The four men, including [Belgrave], Morales, [Charles] Baizar, and [Eduardo Santana], stayed together in this room.

The hotel's videotape demonstrates that at approximately 5:15 p.m. on February [7], 2019, the four men were parked in a Chevrolet Impala in front of the hotel. [Belgrave] was in the front passenger seat; Baizar was in the back[ ]seat. A dark-colored SUV arrived in the parking lot and parked nearby. Baizar and another man exited the Impala and walked toward the SUV. When Baizar attempted to enter the SUV, the SUV's driver exited the vehicle and began shooting at Baizar. Baizar ran away and dropped a package. [Belgrave] reacted to the gunshots by exiting the Impala and firing two shots in the direction of the SUV. Moments later, [Belgrave] was shot and seriously injured.

[Belgrave] and Baizar re-entered the Impala, which then drove away. Subsequently, police stopped the Impala when it was exiting from a parking garage located across from the Marriott. At that time, Baizar was driving the Chevy Impala and [Belgrave] was the front seat passenger. [Belgrave] received treatment for his injuries at a local hospital. The package that Baizar dropped during the gunfight was found to contain 239 grams of heroin.[3]

Baizar was charged with conspiracy to commit possession of a controlled substance with intent to deliver ("PWID").[4] In December 2019, Baizar pleaded guilty to conspiracy.

---

[3] *Commonwealth v. Belgrave*, 307 A.3d 1240, 1242-43 (Pa. Super. 2023).

[4] *See* 18 Pa.C.S. § 903 (criminal conspiracy); 35 P.S. § 780-113(a)(30) (PWID).

Belgrave, too, was charged with conspiracy to commit PWID (amended on the eve of trial to PWID), as well as aggravated assault[5] and other charges. Following a June 2021 jury trial, a jury found Belgrave guilty of PWID, reckless endangerment, and carrying firearms without a license.[6]

At issue in this case is the prosecution's decision to summon Baizar to the witness stand at Belgrave's trial with foreknowledge that Baizar would refuse to answer questions, which Belgrave identified as a looming problem as early as a motion *in limine* filed on the eve of trial. In that motion, Belgrave expressed concern that the prosecution would make reference, in its opening statement, to Baizar's prior statements to investigators and/or his anticipated testimony, despite the likelihood that Baizar would invoke his Fifth Amendment right against self-incrimination and refuse to testify at trial.[7] The foundation of Belgrave's concern was established by Baizar's June 8, 2021 Motion to Quash Subpoena, filed one day before Belgrave's trial began, in which he asserted in no uncertain terms that he had no intention of testifying.

---

[5]     *See* 18 Pa.C.S. § 2702.

[6]     35 P.S. § 780-113(a)(30), 18 Pa.C.S. § 2705, and 18 Pa.C.S. § 6106, respectively.

[7]     *See* Belgrave's Motion *in Limine*, 6/8/2021, at 1-2 ¶¶ 2, 5, and 8 (expressing the belief that the Commonwealth would tell the jury about various statements made by Baizar in its opening statement and that, "if called to testify at trial, Mr. Baizar will invoke his Fifth Amendment privilege against self-incrimination," and asking the court to "preclude the Commonwealth from stating any facts provided by Mr. Baizar in its opening statement"); *see also* U.S. CONST. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."). The Fifth Amendment right against self-incrimination was applied to state proceedings by the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1 (1964).

The Commonwealth sought to compel Baizar's testimony by offering Baizar immunity.[8] Because this obviated Baizar's right not to testify under the Fifth Amendment,[9] his persistence in not testifying was unlawful, and it subjected him to contempt sanctions.[10]

As anticipated, the prosecutor in his opening statement encouraged the jury to look forward to Baizar's testimony, while simultaneously revealing his foreknowledge of Baizar's intent not to cooperate:

> One of the witnesses that will be called today is Mr. Baizar. He's in the courthouse. He's in custody following his charges in this case. I'll be frank with you, Mr. Baizar, he knows exactly what happened. I'm going to put him up on the stand. He is not happy to be there. He does not want to be there. He's going to attempt to not testify. He's going to attempt to not tell you what's going on with his companion. He's going to attempt to hide what's going on with his companion from the system.[11]

When it came time for his testimony, in a colloquy outside the presence of the jury, Baizar declared that he would not answer questions even after being informed of his potential exposure to contempt sanctions.

---

[8] *See* Notes of Testimony ("N.T."), 6/9/2021, at 179-80.

[9] "Self-incriminating statements only may be compelled . . . where the potential exposure to criminal punishment no longer exists. Such is the case with grants of immunity," where the grant of immunity "is coextensive with the scope of the privilege." *Commonwealth v. Taylor*, 230 A.3d 1050, 1065 (Pa. 2020) (quoting, in part, *U.S. v. Kastigar*, 406 U.S. 441, 449 (1972)).

[10] *See In re Investigating Grand Jury of Phila. Cnty.*, 433 A.2d 5, 6 (Pa. 1981) (quoting *In re Grand Jury Investigation*, 600 F.2d 420, 422 (3d Cir. 1979)) ("It has never been disputed that '(e)mbedded in Anglo-American law is the inherent power of the judiciary to coerce obedience to its orders by summarily holding a recalcitrant person such as an immunized witness who refuses to testify at a grand jury proceeding or at a trial in civil contempt, and then imprisoning him until he complies.'").

[11] N.T., 6/9/2021, at 53.

THE COURT: . . . . So what we're going to do, sir, is you're going to go on the stand and then you're going to do what you're going to do. All right? You have to go on the stand at this point. Do you understand?

MR. BAIZAR: I have to go on the stand and do what?

THE COURT: Whatever you and your attorney have discussed. I don't know what you're going to do.

MR. BAIZAR: I'm not going to do anything.

THE COURT: What's that?

[Counsel for Baizar]: He's expressed to me, Your Honor, he's not going to testify.

THE COURT: All right. And I understand that they have the right to put you up there and you can say that if you need to say that.

MR. BAIZAR: Say what?

THE COURT: That you're not going to testify.

MR. BAIZAR: Y'all just need to put it on the record.

THE COURT: We do. And I think that's what [the prosecutor] wants to do in front of the jury. We'll have that on the record. I've explained to you what the possible penalties are, so.

MR. BAIZAR: I understand.[12]

Baizar immediately made good on his promise not to answer questions. Despite anticipating that Baizar would not cooperate, the prosecution called him to the stand. When prompted, Baizar stated his full name under questioning, after which the following exchange ensued:

Q. Sir, do you remember what happened back in February two years ago?

A. Excuse me, I'm not going to answer none of your questions, so there's no need for you to ask me no questions.

---

[12]     *Id*. at 183-84.

Q. Okay. Sir, the question I asked is do you recall what happened back in February of 2019?

A. (No response.)

THE COURT: And, sir, just to cut through it, is it your intent not to answer any questions today?

MR. BAIZAR: It's my intentions [*sic*] not to answer no questions at all.

THE COURT: All right. Outside of your name.

[THE COMMONWEALTH]: Judge, I do have a number of questions I would like him to expressly not answer. He's got a right to not answer them, but he can't avoid me asking them.

THE COURT: You can ask him, but what I want to avoid is dead silence while we all sit here. If you would just say you intend not to answer that, that would be sufficient instead of just waiting for an answer that may not come.

BY [THE COMMONWEALTH]:

Q. My question I'll ask then is: Are you related to Jermaine Belgrave? Do you intend not to answer that?

A. My intention is not to answer anything this guy asks of me.

Q. And you're unhappy with me because I prosecuted you for dealing heroin in this case. Is that fair?

A. No comment.

Q. And you actually were convicted and you're serving a state sentence because of that conviction. Is that fair?

A. No comment.

Q. And you actually didn't plead to possessing controlled substances and delivering it, you pled to conspiracy to deliver a controlled substance. Is that fair to say? I'll note that there's no answer and I'll move on.

And it's also fair to say—.

[THE COMMONWEALTH]: And if I can treat the witness as hostile?

THE COURT: Yes. So noted.

[BY THE COMMONWEALTH]:

Q. You are also a citizen of Belize? He has not answered. Is it fair to say that you were cousins with Mr. Belgrave? No answer. Fair to say that you came to the city of Erie to sell heroin with Mr. Belgrave? Fair to say that that's what you told police during your interview—

[THE DEFENSE]: Objection, Your Honor.

Q. —after you were shot?

[THE DEFENSE]: Objection, Your Honor. Objection. Can we approach?

THE COURT: Yes.

(Discussion held at sidebar on the record.)

[THE DEFENSE]: Your Honor, what he told the police was that he had met this gentleman by the name of Greg before. He had dealt with him two weeks before and he sold him, I think he said, 100 grams of heroin or 250 grams of heroin. And he was asked the question at one time where he said—or he was asked, did you bring the heroin to Erie. He said yeah. He was asked a second time, did you guys come to Erie. And he said, yeah, we came from Chicago.

It's hardly that he came to Erie to sell heroin with Mr. Belgrave.

[THE COMMONWEALTH]: Your Honor, the simplest way—there's a very brief—I am not attempting to misstate it.

[THE DEFENSE]: But you are misstating it.

[THE COMMONWEALTH]: Okay. Then I will just go through his—

[THE DEFENSE]: You want the jury to believe that he told you that before.

[THE COMMONWEALTH]: Well, I have a responsibility to ask him.

[THE DEFENSE]: But that's not what he said.

[THE COMMONWEALTH]: I will read the transcript of his final interview. I'm not attempting—I understand.

[THE DEFENSE]: It doesn't get in.

[THE COMMONWEALTH]: Well, I'm going to ask him about it, did you say this and did you say this and did you say this.

[THE DEFENSE]: If he doesn't answer your question, it doesn't get in.

THE COURT: If it—I will instruct the jury, so you know, [defense counsel]. And I told them at the beginning very clearly questions are not evidence, only the answers. If he does not answer that, then anything that was asked is not to be considered by the jury.

[THE DEFENSE]: I understand.

(Discussion held at sidebar concluded.)

BY [THE COMMONWEALTH]:

Q. Do you recall an interview with Detective Berarducci back on the day you were shot, Mr. Baizar?

THE COURT: Just note no answer.

BY [THE COMMONWEALTH]:

Q. I've never had this happen before. And you were asked a question: we're talking about this incident that occurred. Do you remember telling us drug deal gone wrong, man?

[THE DEFENSE]: Judge, I'm going to object to this. There's no basis to put his statement in previously based on his testimony—his lack of testimony today.

THE COURT: All right.

[THE DEFENSE]: I don't want to argue this in front of the jury. I'll come to sidebar.

THE COURT: Come to sidebar again.

(Discussion held at sidebar on the record.)

[THE DEFENSE]: Judge, this is exactly what I objected to the first time. Under Crawford versus Washington,[13] his statement does not get in

---

[13] *See Crawford v. Washington*, 541 U.S. 36 (2004) (holding that testimonial out-of-court statements by witnesses are barred by the Sixth Amendment's Confrontation Clause unless witnesses are unavailable and defendant(s) had a prior opportunity to cross-examine). In relevant part, the Sixth Amendment provides that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The Sixth Amendment right of confrontation was extended to the states (continued…)

based on what he's saying now. He's not using it to refresh recollection. He's not using it to impeach him. He's trying to bootstrap it in and he's trying to do it through the drug expert report.

THE COURT: I understand he's not going to answer anything, so I think that's—I think that's—you can let it go at this point. He's obviously— you can just say it's your intention not to ask any questions—or ask about anything that happened that day. I agree. I think there is a danger to the defendant if you go through his whole statement. Even when he doesn't answer, you're basically reading his statement to the jury.

[THE COMMONWEALTH]: I can't enter it into evidence, I agree, but [defense counsel] will be able to do that on cross-examination of my witnesses.

THE COURT: I don't know about that. But at this point, he's not going to answer.

[THE COMMONWEALTH]: Understood. I will wrap it up. I just have a couple more.

THE COURT : Okay. But nothing that goes to that.

[THE COMMONWEALTH]: Understood.

(Discussion held at sidebar concluded.)

BY [THE COMMONWEALTH]:

Q. Okay. Fair to say you gave four separate statements back on February 7th, Mr. Baizar? No answer. Fair to say you answered questions during those statements about what happened on February 7th during this incident? And I'll note no answer.

Fair to say that officers attempted to have you perform a lineup of the individuals that robbed you and you didn't want to participate in that because you believe in criminals getting away with crimes? No answer.

THE COURT: No answer on the last one.

[THE COMMONWEALTH]: Just one moment, Your Honor.

THE COURT: That's fine.

---

by the Fourteenth Amendment. *See Pointer v. Texas*, 380 U.S. 400 (1965); *Washington v. Texas*, 388 U.S. 14 (1967).

BY [THE COMMONWEALTH]:

Q. And fair to say that the thing you do not want to do up there is tell the truth about what happened on February 7th of 2019?  And you're one of only three or four—no answer.  I'm sorry, Your Honor.  You're one of only three or four people on earth who know what happened and you're at your cousin's trial and you would rather not tell us.

[THE DEFENSE]: Objection, Your Honor.  There's no evidence they're cousins.

THE COURT:  All right. I'll address it in a minute, [defense counsel]. All right.  No answer on that.

[THE COMMONWEALTH]:  No answer.

THE COURT:  [Defense counsel], do you want to ask any questions?

[THE DEFENSE]:  I have no questions of this witness, Your Honor.[14]

The trial court certainly was aware of the risks that Baizar's silence presented. Immediately in the wake of this exchange, the trial court *sua sponte* offered the following limiting instruction:

Ladies and Gentlemen, let me just tell you something.  As I told you at the very beginning of the trial this morning, the questions put to a witness are not evidence, only the answers are.  So you're only allowed to consider any answers that you heard today when you consider this case, not the questions.[15]

With only questions and no answers, the court constructively admitted that Baizar's appearance had in no way advanced the fact-finding process.

Nevertheless, the prosecutor wasn't done making hay.  At the end of the trial, doubling down on his reliance on Baizar's appearance and refusal to testify, and

---

14    N.T., 6/9/2021, at 185-92.

15    *Id*. at 192.

confounding the trial court's cautionary instruction, the prosecutor underscored Baizar's silence. In his closing argument, he stated:

> Now, I'm going to talk about the individual who, umm, sat on the stand and said nothing yesterday. We would love to provide direct evidence. We would love to put evidence up of what happened; what everyone was thinking. We attempted to call Mr. Baizar. You saw it. We wanted you to hear what happened from the horse's mouth. And Mr. Baizar, we know, knows exactly what happened; knows who was involved; knows what the plan was; knows all of those things. All he had to say was that the Defendant is not involved. Mr. Belgrave is not involved. He refused to say that.[16]

Thus, the prosecutor implored the jury to infer facts from an interaction that in its entirety comprised only unanswered questions.

On appeal to the Superior Court, Belgrave maintained that the Commonwealth erred in calling Baizar to the witness stand, and that the trial erred in allowing the Commonwealth to do so.[17] In support of his argument, Belgrave relied upon this Court's decisions in *Commonwealth v. DuVal*[18] and *Commonwealth v. Terenda*.[19] In those cases, this Court spoke generally against the practice of the Commonwealth calling witnesses who the Commonwealth knew intended not to answer questions. The Superior

---

[16] N.T., 6/10/2021 (Closing Arguments), at 39-40. Defense counsel objected to these comments. The prosecutor responded to the objection: "I believe it is proper. We put the witness on the stand and asked him to testify. We can comment on the fact that he did not respond to any questions." *Id*. at 40. The court overruled defense counsel's objection.

[17] Belgrave also appealed the trial court's decision to permit the Commonwealth to amend the charges against Belgrave on the eve of trial. The Superior Court denied relief on that issue. Notably, although the Superior Court affirmed Belgrave's judgment of sentence, it ordered a remand to the trial court to rectify a sentencing issue that the Superior Court raised *sua sponte*. *See Belgrave*, 307 A.3d at 1254. Neither of these matters are before us presently.

[18] 307 A.2d 229 (Pa. 1973).

[19] 301 A.2d 625 (Pa. 1973) (plurality). Justice Manderino's opinion for the Court was joined by Justices Nix and Roberts. The remaining Justices concurred in the result.

Court conceded on appeal that these cases barred such an event, but distinguished them from this case on the lone basis that, in *DuVal* and *Terenda*, the witnesses explicitly invoked the Fifth Amendment before the jury. Here, while Baizar held his tongue when questioned before the jury as anticipated, he never mentioned the Fifth Amendment in the jury's presence.[20]

On this basis, the Superior Court turned to our decision in *Commonwealth v. Todaro*.[21] There, this Court found no error when a witness outside the hearing of jurors—but while they were present—quietly informed the court that he intended to invoke the Fifth Amendment, and the court excused the witness before he testified. On the Superior Court's account, this was analogous primarily based upon the fact that the jury never *heard* an invocation of the Fifth Amendment.

The Superior Court reasoned:

> The prejudice to be avoided by prohibiting a prosecutor from calling an alleged accomplice to the stand, knowing the witness will assert their privilege against self-incrimination in the presence of a jury, is the human tendency to treat the claim of privilege as a confession of a crime or guilt, thereby creating an adverse inference that the defendant is unable to confront through cross examination. [*DuVal*, 307 A.2d at 234-35]; *see also State v. Allen*, 224 N.W.2d 237, 241 (Iowa 1974). There is a distinct danger that jurors will misconstrue a known co-actor's refusal to testify on Fifth Amendment grounds as evidence of the defendant's guilt by association. [*Todaro*, 569 A.2d at 335.][22]

Here, Baizar did not specifically invoke the Fifth Amendment before the jury. Indeed, "[n]othing about Baizar's refusal to answer or his remaining silent suggested that

---

[20]   *Belgrave*, 307 A.3d at 1246. To be clear, Baizar expressly invoked the Fifth Amendment in pre-trial proceedings pertaining to his willingness to testify.

[21]   569 A.2d 333 (Pa. 1990).

[22]   *Belgrave*, 307 A.3d at 1246-47.

the reason for his conduct was his assertion of his Fifth Amendment privilege. A witness 'does not expressly invoke the privilege by standing mute.'"[23] Thus, "[j]ust as the jury had nothing to infer from [the witness'] departure from the stand in *Todaro*, so too there was nothing to infer from Baizar's refusal to answer or remain silent."[24] In effect, the lower court's theory ran, a jury will make no adverse inference from mere silence in the face of an onslaught of even the most damning narrative questions *unless* the witness expressly invokes the Fifth Amendment. Notably, the *Todaro* Court made no assertion so sweeping.

Based upon its narrow analogy to this Court's decision in *Todaro*, the Superior Court affirmed Belgrave's judgment of sentence. This appeal followed.[25]

1973 was a banner year in this Court for cases addressing prosecutors' summoning of witnesses expected not to answer questions. First came this Court's plurality decision in *Terenda*.[26] In that case, David Terenda, Ronald Bellan, and George Johnson were indicted for the same killing. During Terenda's trial, with Bellan's and Johnson's trials pending, the prosecution summoned Bellan and Johnson to testify. Counsel for both witnesses advised the court at sidebar that their respective clients would invoke the Fifth Amendment rather than testify. Nonetheless, the Commonwealth called

---

[23] *Id*. at 1248 (quoting *Salinas v. Tex.*, 570 U.S. 178, 187 (2013)). *Salinas* involved the admissibility at trial of non-custodial silence during an investigation and said nothing about the effect of unexplained silence under questioning in a trial setting.

[24] *Id*.

[25] Because this case presents a question of law, our standard of review is *de novo*, and the scope of our review is plenary. *See Commonwealth v. Crawley*, 924 A.2d 612, 614 (Pa. 2007).

[26] *See supra* n.19.

both men and asked each one various questions asserting or implying aspects of their participation in the killing. Each witness invoked the Fifth Amendment and refused to answer questions.

A plurality of this Court found that summoning Bellan and Johnson was improper and prejudicial to Terenda. Prior testimony had indicated that both Bellan and Johnson were with Terenda at the time of the killing, and for that reason,

> the jury could reasonably have drawn inferences adverse to Bellan and Johnson and transferred these adverse inferences to the appellant. As stated by Professor Wigmore at 8 Wigmore, Evidence § 2272, 426 (McNaughton rev. 1961): 'The layman's natural suggestion would probably be that the resort to privilege in each instance is a clear confession of crime.' Since the jury could reasonably have drawn inferences adverse to appellant, the appellant was entitled to cross-examine the witnesses. This, of course, was impossible, because the witnesses invoked the Fifth Amendment. Once testimony has been presented to a jury from which adverse inferences can be drawn, the [defendant] cannot be deprived of the opportunity to challenge those inferences in the jury's mind.[27]

The plurality asserted that "[c]onvictions should not be obtained with any suspicion of prosecutorial misconduct. In this case, the prosecution and the court knew that the co-indictees would invoke the Fifth Amendment. The witnesses should, therefore, not have been permitted to take the stand."[28] The impropriety was exacerbated when "[t]he questioning continued with a clear and deliberate attempt to plant in the jury's mind . . . evidence of an association between the witnesses and the appellant during the time of the killing."[29] Notably, the plurality characterized this as "prosecutorial misconduct" as

---

[27] *Terenda*, 301 A.2d at 628.

[28] *Id*. at 629.

[29] *Id*.

well as a violation of the defendant's right of confrontation, identifying each as an independent basis for invalidating Terenda's convictions.[30]

Later in 1973, this Court decided *Duval*, this time in a majority decision.  The *dramatis personae* in *DuVal* were defendant DuVal, DuVal's "mistress" D'Ulisse, victim Springbett, and Springbett's "mistress" McCabe, who allegedly was staying with DuVal and D'Ulisse.  During a visit by Springbett, Springbett hit McCabe.  DuVal retrieved a gun and fatally shot Springbett.

During DuVal's preliminary hearing, grand jury proceeding, and *habeas corpus* hearing, D'Ulisse and McCabe testified.  But shortly before trial, both women consulted an attorney, indicating afterward that they would invoke the Fifth Amendment at DuVal's trial and refuse to testify.  This was confirmed when McCabe was called on the first day of trial, offered only her name, and refused to answer any other questions.  Out of the jury's presence, the court determined that McCabe had waived her right to invoke the Fifth Amendment by virtue of her past testimony in preliminary proceedings, and the court directed her to testify.  She continued to refuse, and she ultimately was held in contempt.  The prosecution then called D'Ulisse, and effectively the same sequence of events ensued.

The *DuVal* Court began by reviewing *Terenda*, in which the plurality asserted that "it is prejudicial error for a prosecutor to summon a witness to the stand in a criminal trial with foreknowledge that the witness intends to invoke a privilege against self-incrimination."[31]  The risk, we explained, is "that the jury will make improper inference

---

[30]     *Id*.

[31]     *DuVal*, 307 A.2d at 231-32.

from the mere refusal of the witness called to testify at all."[32]  The *Duval* Court observed

that, in *Commonwealth v. Greene*, we "held that it is not permissible for either defense or

prosecution to attempt to capitalize" on a refusal to testify, there relative to a defense

witness.[33]  Importantly, the Court observed,

> [w]here it is the prosecutor who attempts to use such a device, there is a special vice: the inference to be drawn from the refusal to testify of the defendant's co-defendant, accomplice or associate has [n]o probative value whatsoever in establishing the guilt of the defendant.  It is rather an effort to cause the jury to think 'guilt by association.'[34]

The jury in *DuVal* knew at the time of the witnesses' refusals that D'Ulisse and

McCabe were present when Springbett was shot and killed.  This, in turn, created an

association of the women with Springbett.  The Court deemed it an available, but

"fallacious" inference that DuVal also must have criminal responsibility for the death of

Springbett.[35]

The Court rejected the Commonwealth's claim that it had believed in good faith

that the women would testify because, as the trial court ruled, it believed that they had

waived the privilege with their prior testimony.  The Court rejected this for two reasons.

---

[32]     *Id*. at 232.

[33]     *Id*. (citing *Commonwealth v. Greene*, 285 A.2d 865 (Pa. 1971)).  In *Greene*, defense counsel sought to call to the stand an individual to whom counsel sought to impute responsibility for the events charged.  The court ascertained outside the presence of the jury that the individual would invoke the Fifth Amendment on the stand.  The trial court disallowed the defense's effort to call him to the stand, and also instructed the jury not to make an adverse inference from defendant's failure to call that individual to testify.

[34]     *Id*. at 232-33.

[35]     *Id*. at 233.

First, the trial court's finding of waiver was "directly contrary" to this Court's ruling in

*Snyder's Appeal.*[36]  Second, and more importantly for present purposes,

> [w]e disagree[d] with those jurisdictions in which it is held that the prosecution may with impunity call before the jury a witness likely to be associated with the defendant in the minds of the jurors, knowing that a privilege against self-incrimination will be claimed and yet believing that the claim of privilege will be legally invalid.  It is a simple matter for the prosecuting attorney to inform the court that a witness he intends to call will, to his knowledge, attempt to invoke a privilege against testifying, and obtain a ruling thereon.[37]

In effect, this Court urged a before-the-fact proceeding to assess a recalcitrant witness' willingness to testify, invite any offers of immunity or identifications of prior waivers of the witness' right not to incriminate himself, and, if need be, to address whether the witness intends to withhold his testimony notwithstanding.  At that time, the court can stress the prospect of contempt and the attendant risk of punishment.  Thus, we held that mere belief—accurate or otherwise—that any assertion of the privilege would be legally infirm was no excuse for not seeking an advance determination on what the witness would actually do in order to ensure that no refusal to testify, valid or invalid, occurred in the jury's presence.[38]

---

[36]     *Commonwealth v. Fisher (Snyder's Appeal)*, 157 A.2d 207 (Pa. 1960).  In *Snyder's Appeal*, the Court held that Snyder's prior testimony did not obviate her right not to be compelled to testify later in a way that incriminated herself.  The right not to be compelled, we explained, "does not refer to any particular place or at any particular time. . . .  [T]he fact that [the witness] has willingly admitted circumstances adverse to [her] own interests can never be made the basis for compelling [her] to make further admissions." *Id*. at 210-11 (emphasis omitted).

[37]     *DuVal*, 307 A.2d at 234.  This Court reaffirmed this aspect of *DuVal*'s holding in *Commonwealth v. Virtu*, 432 A.2d 198, 202-03 (Pa. 1981) (quoting *DuVal*).

[38]     Again in 1973, the Court reaffirmed this proposition in *Commonwealth v. Davenport*, 308 A.2d 85, 86-87 (Pa. 1973) (calling for a pre-appearance hearing concerning a recalcitrant witness' intentions and holding that the Commonwealth's belief (continued…)

As set forth above, the parties and the court adhered to precisely this procedure in this case.  Baizar's intention not to testify was unequivocally established before the judge and on the record outside the jury's presence.  The prosecutor secured a promise of immunity sufficient to invalidate Baizar's reliance upon the Fifth Amendment.  The court informed him that, should he opt not to testify, he would be subject to contempt and potential imprisonment.  And Baizar, with knowledge of the potential consequences, still declared that he would not answer questions immediately before he was set to appear.

In *Todaro*, this Court reached a contrary result under very different facts.  There again, the issue was the prosecution's decision to call the defendant's co-conspirator to testify and the co-conspirator's invocation of the Fifth Amendment privilege.  The difference, though, was the circumstance of the invocation and what followed.  In *Todaro*, the prosecutor claimed to have believed that the witness intended to testify based upon prior representations.  But when the witness was called at trial, immediately after swearing in, he turned to the judge and asked to invoke the Fifth Amendment, indicating that he did not wish to testify.  Because he had not yet been sentenced on his guilty plea in the same matter, the court deemed the request proper.  The jury was excused and a conversation ensued in which the court declined to grant a mistrial.  When the jury returned, the witness stand was empty and the co-conspirator never again appeared in the courtroom.[39]

The *Todaro* Court distinguished *DuVal* and found no error.  The Court alluded to "[t]he vice of permitting a co-actor to assert the privilege against self-incrimination in front

---

that the witness has no Fifth Amendment recourse is insufficient reason for calling such a witness to the stand).

[39]     *Todaro*, 569 A.2d at 334-35.

of the jury" that was explained by this Court in *DuVal*, emphasizing concern for guilt by association, and the assertion that mere invocations of the Fifth Amendment have "no probative value whatsoever."[40]  Moreover, we acknowledged that "there is a distinct danger that a refusal to testify on Fifth Amendment grounds will be taken by some jurors, improperly, as evidence of guilt."[41]  In *Todaro*, though, the privilege was not asserted for the jurors to hear, the prosecutor asked no questions before the jury, and it was unclear to the Court "how [the jurors] could draw any reasonable inference of anything" from what little they had witnessed—primarily the witness' brief appearance and subsequent withdrawal without submitting to any sort of questioning.[42]

We find the analogy to *Todaro* deeply flawed.  The "silences" in question in *Todaro* and in this case categorically differ, as does the prosecutor's conduct in each case.  The silence in *Todaro* was the silence of a total lack of activity in the jury's hearing, not defiant silence before the jury in the face of accusatory questioning that directly implicated the defendant.  Thus, the *decision* to call the witness to the stand was untainted in a way that distinguished that case from *Terenda* and *DuVal*, where everyone was on notice regarding the witnesses' intentions not to answer questions.  Furthermore, in *Todaro* there evidently was no foreknowledge on anyone's part that the witness intended to stand silent.  And when the witness told the court of his intention, the prosecutor did not insist upon forcing the witness to stand mute before the jury in the face of insinuating questioning.

---

[40]     *Id*. at 335; *see DuVal*, 307 A.2d at 232-33.

[41]     *Todaro*, 569 A.2d at 335.

[42]     *Id*.

Not only have we identified summoning a known recalcitrant witness to appear before a jury as impermissible and prejudicial in itself,[43] we have gone so far as to identify it as professional "misconduct."[44]  And our case law makes clear that it is the act of summoning such a witness to refuse to answer questions before a jury that dictates the result[45]—at least provided that questions are asked and unanswered.  As stressed in *DuVal* and *Davenport*, the proper procedure is to test and ascertain in advance the witness' intentions before the witness is summoned to testify before the jury.

Furthermore, *DuVal* only sporadically mentioned the invocation of the Fifth Amendment, emphasizing the "mere refusal of the witness called to testify at all."[46]  The prejudicial error identified in that case unequivocally was the choice to call the witness, not what transpired once the witness took the stand.  This choice, we held, was prejudicial

---

[43]     *See Davenport*, 308 A.2d at 86-87 (holding that the prospect of the witness refusing to testify should be settled outside the presence of the jury by assessing the witness' intentions *before* that witness goes before the jury); *accord Commonwealth v. Johnson*, 488 A.2d 327, 329-330 (Pa. Super. 1985).

[44]     *See, e.g., Virtu*, 432 A.2d at 200-201 (identifying as "misconduct" the prosecutor's insistence upon calling a witness to the stand who he knew intended to invoke the Fifth Amendment in front of the jury).

[45]     The Superior Court in this case seemed to acknowledge as much, when it wrote that Belgrave was correct that "it is prejudicial error for a prosecutor to call a witness to the stand knowing that the witness will invoke their privilege against self-incrimination." *Belgrave*, 307 A.3d at 1246.  And it is indisputable that, in pre-trial proceedings, Baizar had expressly invoked the Fifth Amendment before the judge and the attorneys.  But then the Superior Court skipped from what the prosecutor knew when he summoned Baizar to the stand to what happened after Baizar was summoned, bootstrapping the analysis past the point at which the prosecution made the problematic decision.

[46]     *See DuVal*, 307 A.2d at 232 ("Here the risk is not that the jury will misuse evidence which directly states that the defendant is the criminal, but rather that the jury will make improper inference from *the mere refusal of the witness called to testify at all*." (emphasis added)).

error in itself, regardless of the prosecutor's belief that the witness would have no recourse to the Fifth Amendment. The point is to head off the harm before it happens.

While reversible error occurs simply when a witness is called to appear before a jury whom the summoning party has reason to expect will not answer questions, we nonetheless emphasize the extent to which this case underscores—in the most egregious way—precisely the harm that such a rule aims to forestall. The prosecutor in this case became the *de facto* testifying witness, imputing criminality to Baizar—and suggesting Belgrave's guilt by association with that criminality—through eighteen predominantly leading questions. But neither could Belgrave meaningfully confront Baizar on the matters for which he was summoned nor could he cross-examine the prosecutor to test the veracity of the propositions suggested by his unanswered questions.[47]

Finally, we emphasize that the notion that defiant silence under questioning is *only* inculpating when it follows explicit resort to the Fifth Amendment defies common sense. The prejudicial harm lies in the refusal to deny accusations that a reasonable juror can be expected to treat as an implied admission, harm that stands separate from an assertion of a particular legal basis for refusing to deny the accusations, though invoking the Fifth Amendment arguably may exacerbate things. To allow such an artificial distinction to

---

[47]    In *Douglas v. State of Alabama*, the United States Supreme Court highlighted a very similar concern in a slightly different context:

> Although the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true.

380 U.S. 415, 419 (1965).

control the result in these circumstances would mark the triumph of form over substance.[48]

This case is very similar to *DuVal*. Here, the prosecution was on notice that Baizar intended to refuse to answer any questions. On June 8, 2021, Baizar filed a "Motion to Quash Subpoena and/or Notice of Intention to Assert Privilege Against Self-Incrimination," in which Baizar asserted that, "if called as a witness in Mr. Belgrave's trial, Mr. Baizar intends to assert his privilege against self-incrimination pursuant to the Fifth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution."[49] He explained that he would invoke the Fifth Amendment because, although he had pleaded guilty, he had filed an appeal of his judgment of sentence, and the Superior Court agreed with his challenge to the legality of sentence and remanded to the sentencing court, where, as of Belgrave's June 9, 2021 trial date, Baizar's case

---

[48]    Elsewhere, we have made statements to this effect. For example, in *Commonwealth v. Wright*, under somewhat different circumstances nonetheless concerning a prosecution's attempt to introduce damning indirect evidence against the defendant, we cited *DuVal* and *Terenda* and observed that "[t]he prosecution may not suggest by indirection what it is barred by the rules of evidence or testimony privilege from demonstrating by direct testimony." 321 A.2d 625, 627 (Pa. 1974). The Superior Court cited *Wright* in *Commonwealth v. Musolino*, 467 A.2d 605, 610-11 (Pa. Super. 1983), in which the court extended the *DuVal* principle to circumstances in which the prosecution had advance notice that a witness intended to invoke the priest-penitent privilege. In *Commonwealth v. Mathis*, one judge analogized the prejudice identified with the *DuVal* scenario to a case in which the prosecution commented on the lack of testimony of a witness who did not appear, inviting the jury to draw an adverse inference from the defense's failure to call the witness in question. 409 A.2d 63, 69 n.1 (Pa. Super. 1979) (Spieth, J., concurring).

[49]    Motion to Quash Subpoena, 6/8/2021, at 1 ¶ 4.

awaited resentencing.[50]  Furthermore, Baizar made clear his intention not to testify, even under threat of contempt, when questioned outside the jury's presence.

Thus, as in *DuVal*, we hold that the prosecutor in this case committed misconduct when he summoned Baizar to appear before the jury with foreknowledge that Baizar had invoked his Fifth Amendment right and made clear that he would not answer any questions under any circumstances.  As in *DuVal*, we maintain the validity under the Fifth Amendment of the witness' determination not to testify in the face of a grant of immunity is immaterial when the will to remain silent is clear.  And as in *DuVal*, we further conclude that when faced with such misconduct, the defendant is entitled to a new trial.

Saying as much provides sufficient grounds for our disposition, and our analysis could stop there.  But we further conclude that the Commonwealth has not established that the error was harmless beyond a reasonable doubt.  This Court has explained:

> An error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict.  Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless.  The Commonwealth bears the burden of proving that the error was harmless beyond a reasonable doubt.[51]

We have identified three circumstances in which an error is harmless:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*;
> (2) the erroneously admitted evidence was merely cumulative of other

---

[50]    *Id*. at 4-5 ¶¶ 20-21; *see Commonwealth v. Baizar*, 449 WDA 2020, 2021 WL 1716967 (Pa. Super. April. 30, 2021) (memorandum) (remanding for further proceedings to determine whether the imposition of certain fees was within the sentencing court's legal authority to impose), *dismissed as moot by Commonwealth v. Baizar*, 449 WDA 2020, 2021 WL 4440537 (Pa. Super. Sept. 28, 2021) (judgment order).  Baizar also noted the continuing prospect of collateral relief.  *See Commonwealth v. Rodgers*, 372 A.2d 771, 782 (Pa. 1977) (plurality) ("We cannot say that the possibility that an individual whose conviction is final will obtain collateral relief is so remote as to warrant a *per se* rule that the [right not to incriminate himself] cannot be invoked in any circumstance.").

[51]    *Commonwealth v. Fitzpatrick*, 255 A.3d 452, 483 (Pa. 2021) (cleaned up).

untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.[52]

Here, in one sentence, the Commonwealth baldly asserts that the error was *de minimis* and that the remaining evidence of guilt was overwhelming.[53]

Our reasons for rejecting this assertion are best illustrated by the Commonwealth's own conduct. The prosecution's desire to elicit Baizar's testimony—or perhaps his strongly suggestive silence—prompted herculean efforts, illustrating better than any inferential analysis just how critical the prosecution considered Baizar's testimony to be in establishing Belgrave's guilt. The prosecution went to great lengths to secure and document the necessary promise of broad immunity directly from the District Attorney. Furthermore, in his opening and closing statements, the prosecutor repeatedly emphasized Baizar's knowledge of events, the prospect of his testimony, and his refusal to testify.[54]

In *Berger v. United States*, the United States Supreme Court explained:

[The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . He may prosecute with earnestness and vigor—

---

[52]    *Commonwealth v. Chmiel*, 889 A.2d 501, 521 (Pa. 2005).

[53]    Cmwlth.'s Br. at 12.

[54]    In a telling part of the exchange, the prosecutor openly speculated as to Baizar's motives for not testifying. N.T., 6/9/2021, at 191 ("And fair to say that the thing you do not want to do up there is tell the truth about what happened on February 7th of 2019? And you're one of only three or four—no answer. I'm sorry, Your Honor. You're one of only three or four people on earth who know what happened and you're at your cousin's trial and you would rather not tell us.").

indeed he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.[55]

Thus, the prosecutor's duty to adhere to the restrictions imposed upon his trial tactics is an affirmative one, not one to be trifled with in the hope that the trial court will look the other way. Indeed, in *Virtu*, this Court went farther than merely vacating a conviction. Finding "extraordinary prosecutorial misconduct" in the Commonwealth's election to present a witness whom the prosecution had reason to expect would stand silent, the Court dismissed the charges outright.[56]

Ultimately, *DuVal* is controlling authority. The prosecutor knew or should have known by the time that he summoned Baizar to appear before the jury that he had no business doing so. The trial court should have decided in advance, based upon Baizar's assurances outside the presence of the jury that he would not answer questions, that the categorical lack of probative value of the non-testimony Baizar promised rendered his appearance before the jury impermissible. And because this implicates prosecutorial misconduct, like the *DuVal* Court we will not delve too deeply into conjecture regarding the effect of Baizar's appearance upon the jury. Like the Court in *DuVal*, we hold that allowing a prosecutor to summon and question a witness before a jury whom he or she has clear reason to expect will stand silent under questioning is reversible error. To the extent prior case law suggests this is only the case when the witness expressly invokes the Fifth Amendment, that case law is qualified accordingly.

---

[55] 295 U.S. 78, 88 (1935); *see Virtu*, 432 A.2d at 203 (quoting this passage).

[56] *Virtu*, 432 A.2d at 203-04.

We reverse the Superior Court's decision, vacate Belgrave's judgment of sentence, and remand without prejudice to the Commonwealth's prerogative to retry Belgrave, should it so choose.

Chief Justice Todd and Justices Donohue, Dougherty, Mundy, Brobson and McCaffery join the opinion.